SAVANNAH, FLORIDA & WESTERN RAILWAY CO. *v.* BUNDICK.

Inasmuch as the interstate commerce act prohibits not only contracting for, but also collecting, a less rate of freight on interstate shipments than that specified in the schedule of rates in force at the time (such schedule being required by the act to be printed and kept in every station for inspection and use by the public), a common carrier who has complied with the terms of the act in respect to providing and keeping the schedule is not precluded from collecting from a shipper the full schedule rate, because by mistake a less rate was named to him by the carrier at the point of shipment and also inserted in a bill of lading signed both by the carrier and the shipper, no fraud or willful deception having been practiced or attempted. On discovery of the mistake, after the shipment but in time to correct it at the point of destination, it may there be corrected by the exaction of the full schedule rate and payment of the same by the shipper, he being also the consignee, as a condition to surrendering the goods to him, the transportation being fully completed. Should he refuse to comply with the condition, the detention of the goods by the carrier to enforce payment of the correct charges is no conversion.

October 15, 1894.

Complaint in trover. Before Judge SWEAT. Ware superior court. November term, 1893.

ERWIN, DUBIGNON & CHISHOLM, and S. W. HITCH, for plaintiff in error. L. A. WILSON and ATKINSON, DUNWODY & ATKINSON, *contra.*

LUMPKIN, Justice.

The plaintiff below shipped nine horses over the Savannah, Florida & Western Railway from Gainesville, Fla., to Waycross, Ga., having the shipment consigned to himself. According to his testimony, the company's agent at the shipping point expressly informed him that the rate would be $19.70. Certainly, this amount was inserted in the bill of lading, which was signed both by

him and the agent. There can, however, be no possible doubt that this rate was less in amount than that specified for a shipment of this kind in the schedule of rates in force at that time. There was evidence in behalf of the company, tending to show that the plaintiff was in error in stating that the rate quoted to him was $19.70. But be this as it may, it cannot be doubted, taking into consideration all the evidence, that if such rate was named to the plaintiff, it was the result of a mistake, and it is also perfectly clear that the insertion of this rate in the bill of lading was the result of a mistake on the part of the agent's clerk. There is nothing whatever in the record to suggest that any fraud or willful deception was practiced upon the plaintiff, or that anything of this kind was attempted. Taking the case in its most favorable light for him, he obtained a rate less than that which ought to have been charged; and granting that he was perfectly honest in the matter, the fact that he secured the reduced rate was due solely to a mistake, or mistakes, on the part of the company's servants, who were themselves acting with perfect honesty and in good faith. The mistake in the bill of lading being discovered before the horses reached Waycross, the company's agent at that point was advised by the agent at the shipping point to collect the proper charges, which amounted to $29.70.

There was some contention that the horses were delivered to Bundick at Waycross, and afterwards taken from his possession by the company's agent for the purpose of enforcing the payment in full of the $29.70. This contention, however, is not borne out by the evidence as a whole, nor, indeed, by the testimony of Bundick himself taken alone. It does appear that he paid to a servant of the company $20.00, which was thirty cents more than the amount expressed in the bill of lading, and was permitted to take the horses out of

the car and to a neighboring livery-stable for the purpose of feeding them. This person, however, had no authority either to receive the money or to deliver the horses, and expressly notified Bundick that the permission to take his horses from the car was subject to the approval of the agent who did have authority to make delivery. The agent last named, on receipt of the $20.00 from his subordinate, at once sent for Bundick and informed him he must pay $9.70 more; and upon the refusal of the latter so to do, took charge of the horses and refused to deliver them to Bundick. The truth of the case therefore is, that there was no delivery to Bundick, that he refused to pay the legal rate of freight when demanded of him, and that the company retained possession of the horses; and it also appears that the company afterwards caused them to be sold for the purpose of collecting in full the proper charges.

Bundick brought an action against the company for the value of the horses, and there was a verdict in his favor. Quite a number of questions were presented by the motion for a new trial, but the case really turns upon the propositions announced in the head-note. This was an interstate shipment, and therefore must be governed by the provisions of the interstate commerce act. That act prohibits, not only contracting for, but also collecting, a less rate of freight on such shipments than that specified in the schedule of rates in force at the time; and the act requires that such schedule shall be printed and kept in every station for inspection and use by the public. It appeared unmistakably in this case, that the railway company had fully complied with the law in reference to providing and keeping the schedule. One of the main purposes of the act in question is to prevent carriers subject to its provisions from making discriminations either for or against any of its customers, and to compel such carriers to observe uniformity and equality in their

dealings with all shippers. Therefore, it was unlawful for this company to make in Bundick's favor a rate of freight less than that which, under the schedule, it was required to charge every customer. It makes no difference whether Bundick was, or was not, ignorant that the rate named to him was an unlawful one. Under no circumstances would he be entitled to the benefit of a rate which was denied to other customers. To so hold would be in the very teeth of the statute, and would utterly defeat its purpose to prevent just such discriminations. Such advantage as he could gain under the terms of the statute, and no more, would be the precise measure of Bundick's rights under any contract of shipment he might make with the carrier. Besides, he might easily have informed himself upon this point by merely inspecting the schedule which the law required to be kept, and to which, as the evidence discloses, he had ready access. If the company's agent at the shipping point had willfully deceived him, and thus have fraudulently induced him to make a shipment which he would otherwise not have made, and to his damage, we are not prepared to say he would not have a cause of action of some kind against the company to redress the tort; but we are quite certain, under the facts of this case, he had no right to rely on and enforce the illegal contract, which, at best, resulted alone from innocent mistake. Nor has he any right to an action of any kind against the company to maintain which he must necessarily invoke the illegal contract in question. " The general rule of law is, that a contract made in violation of a statute is void; and that when a plaintiff cannot establish his cause of action without relying upon an illegal contract, he cannot recover." Hancock *v.* L. & N. R. R. Co., 145 U. S. 426, and authorities there cited.

Our ruling that the railway company was entitled to collect the proper legal charges, notwithstanding the

insertion in the bill of lading of an erroneous and illegal rate of freight, is supported by Rowland v. New York &c. R. R. Co., 61 Conn. 103, 49 Am. & Eng. R. R. Cas. 61. Another case somewhat in point is that of Baird v. St. L. &c. Ry. Co., 41 Fed. Rep. 592. In that case the error in the bill of lading resulted from the fraud or mistake of the consignor, but nevertheless the plaintiff, who was the consignee, insisted that the carrier was bound by the rate named in the bill of lading, under the statute of Arkansas making it unlawful for any railroad company to collect a greater sum for transporting freight than that specified in the bill of lading. After stating that such construction of the statute would enable the plaintiff to profit by his own fraud or mistake, and that the statute was not susceptible of any such construction, Caldwell, J., adds, that even if the statute in question would admit of the construction contended for by the plaintiff, it would avail him nothing, because the shipment, being from New Orleans to Little Rock, was interstate commerce, and therefore the act of Congress would control. It was accordingly adjudicated that, under the provisions of this act, the railway company was entitled to collect the legal rate of freight, notwithstanding the error in the bill of lading.

On the other hand, the Supreme Court of Alabama, in Mobile & Ohio R. R. Co. v. Dismukes, 94 Ala. 131, 49 Am. & Eng. R. R. Cas. 42, took a different view of the questions involved in the case before us; but after giving the opinion of McClellan, J., a careful perusal and consideration, we remain satisfied with our own conclusions, as above expressed.     *Judgment reversed.*