RALEIGH & GASTON R. R. CO. *et al. v.* SWANSON.

1. A contract entered into between a railroad company and a ticket-broker, whereby the latter is enabled to sell tickets to individuals over the company's lines leading from this to another State, at less than the established rate for the sale of tickets by its regular agent between the same points and for the same accommodations, is in violation of the act of Congress "to regulate commerce," approved February 4, 1887.
2. A party to such a contract can not recover in an action which does not seek to disaffirm but to enforce it by suit for its breach.
3. A demurrer by the defendant, upon the ground that such a suit set forth no cause of action, should have been sustained.

Argued December 2, — Decided December 20, 1897.

Action for damages. Before Judge Berry. City court of Atlanta. January term, 1897.

*Erwin & Brown* and *Vasser Woolley*, for plaintiffs in error.
*W. R. Hammond* and *L. P. Skeen*, contra.

LEWIS, J.  Swanson brought an action against the Raleigh & Gaston and Seaboard & Roanoke Railroad Companies as joint lessees of the Georgia, Carolina & Northern, the Carolina Central, and the Raleigh & Augusta Railroads, which constitute the system known as the Seaboard Air-Line, extending from Atlanta, Georgia, to Norfolk, Virginia, for breach of contracts. In his petition he alleged, in substance, as follows: He being a ticket-broker in Atlanta, Ga., and in position to control a great amount of business over the various roads centering there and leading therefrom, and defendants desiring to have tickets over their system handled by him, procured the

Suwanee River Railroad Company, a corporation of Florida, to issue a large number of tickets from Ellaville, in that State, via Atlanta, and over the Seaboard Air-Line to Norfolk, Virginia, and others to Washington, D. C., via Weldon, N. C., which tickets were not to be used from Ellaville to Atlanta, but only from Atlanta to the points above stated. Defendants agreed with plaintiff, that if he would purchase and handle these tickets, they would honor them for passage over their system of railroads to the points named. In pursuance to said agreement, he did purchase a large number of said tickets from the Suwanee River Railroad Company, at such prices as were agreed upon, as would enable him to sell the same for passage over the Seaboard Air-Line below the regular rates as established by defendants, and make a profit thereon in the regular course of business as a ticket-broker, and sold a great number of said tickets from time to time, all of which were duly honored by defendants over their said lines until September, 1894, when they notified him that said tickets would be withdrawn, and that they would no longer honor them. He then had on hand undisposed of a large number of said tickets which he had purchased from the Suwanee River Railroad Company in accordance with this agreement with defendants, for which he had paid $909.00, and which were therefore worthless to him and of no value whatever. In the same month and shortly after the date when the tickets were so withdrawn, he notified defendants that he held them and that they were worthless, and demanded that the defendants should make them good and reimburse him in the sum that he had paid for them, which defendants failed and refused to do; but, recognizing their liability to him, proposed that if he would take the tickets he then had on hand and get the Suwanee River Railroad Company, in lieu thereof, to issue what are known as exchange orders on the Seaboard Air-Line, each order to call for a first-class ticket from Atlanta to Norfolk over the Seaboard Air-Line, defendants would then honor, from time to time, as might be presented to them by plaintiff, as many of said exchange orders as would be necessary at the rate of $9.00 each, to cover the value of the tickets which he then had on hand. This agreement was en-

tered into on condition that he would guarantee to hold the defendants harmless against loss should the Suwanee River Railroad Company fail and refuse to pay and settle with defendants for said exchange orders. Plaintiff acceded to all these demands of defendants, obtained such exchange orders from the Suwanee River Railroad Company by surrendering to it said tickets which he then had on hand, and tendered one of said exchange orders, together with his written guarantee to defendants that he would hold them harmless against loss should the Suwanee River Railroad Company fail to settle with them for said orders, and demanded of defendants a ticket from Atlanta to Norfolk over the Seaboard Air-Line, in accordance with the agreement before stated. Defendants accepted said written guarantee of plaintiff, dated February 7, 1895, and now have the same. The defendants refused to honor said exchange order, but retained it and refused to deliver to plaintiff a ticket therefor, in accordance with said agreement; but instead, notified plaintiff that they would not honor any of said exchange orders, and would not issue to plaintiff any tickets therefor, as they had agreed to do, until the Suwanee River Railroad Company had made good to them certain arrearages which had accrued prior to the time of the contract between plaintiff and defendants in reference to said exchange orders. That plaintiff, by reason of the breach of said contract, has been damaged $1,212.00, because the tickets which he would have received under said contract for said exchange orders were worth to him and would have been sold for $12.00 apiece, and he would have been entitled to 101 tickets under said contracts. Plaintiff, by amendment to his declaration, to meet one of the grounds of the demurrer of the defendants, more specifically alleged the number of tickets on hand, the price at which they were bought and the price at which they could have been sold. To this petition the defendants demurred, among others, upon the ground, that the contracts declared on were illegal, contrary to public policy, the laws of the United States and the State of Georgia; and that it therefore set forth no cause of action. This demurrer was overruled by the trial judge, and we are now to consider whether or not he erred in so doing.

1. Section 2 of the act of Congress entitled "An act to regulate commerce," approved February 4th, 1887 (United States Statutes at Large, 1886–90, p. 379), provides as follows: "That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful." Section 10 of the same act, as amended by the act of March 2nd, 1889 (United States Statutes at Large, 1886–1890, p. 857), provides as follows: "That any common carrier subject to the provisions of this act, or, whenever such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, lessee, agent, or person, acting for or employed by such corporation, who, alone or with any other corporation, company, person or party, shall wilfully do or cause to be done, or shall willingly suffer or permit to be done, any act, matter, or thing in this act prohibited or declared to be unlawful, or who shall aid or abet therein, or shall wilfully omit or fail to do any act, matter or thing in this act required to be done, or shall cause or willingly suffer or permit any act, matter, or thing so directed or required by this act to be done not to be so done, or shall aid or abet any such omission or failure, or shall be guilty of any infraction of this act, or shall aid or abet therein, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any district court of the United States within the jurisdiction of which such offense was committed, be subject to a fine of not to exceed five thousand dollars for each offense: *Provided*, that if the offense for which any person shall be convicted as aforesaid shall be an unlawful discrimination in rates, fares, or charges, for the transportation of passengers or

property, such person shall, in addition to the fine hereinbefore provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court." One purpose of this act was to prevent any railroad company, engaged in the transportation of passengers from any State or Territory to another, from charging any person or class of persons a rate other than that established for others under substantially similar circumstances and conditions. Such discrimination is declared by the statute itself to be unjust, and can not be effected, either directly or indirectly, by any device whatever. It would follow from this, that any scheme entered into by such a railroad company with a view of placing upon the market tickets over its line to be sold individuals at a less rate than they could be procured at its regular ticket-office in the usual course relating to the transaction of such business would be unlawful. Indeed, the parties to this case seem to recognize that it would be unlawful to place in the hands of a broker tickets direct from its terminus in Atlanta to other points outside of this State, and to charge therefor less than its established rate. It would not necessarily have been in violation of the statute for the Florida corporation, acting in concert with the defendants, to have issued tickets from Ellaville in that State, via Atlanta, to Norfolk, Virginia, at a less rate per mile than tickets could be procured over defendants' lines alone from Atlanta to Norfolk. Hence, in order to evade the statute, a device was entered into by the parties to this contract to have these tickets issue from Ellaville via Atlanta. The purpose of this was not to sell tickets to parties desiring transportation from Ellaville, but to parties desiring transportation from Atlanta over defendants' lines alone. Therefore, that portion of the ticket from Ellaville to Atlanta was discarded under the contract between the parties, and could have been used only as a mere device to evade the statute; otherwise, why did not the defendant companies issue tickets to the plaintiff directly from Atlanta? To contend that a railroad company can offer tickets to individual passengers through its brokers at a less rate than that established for their sale by its regular ticket-agent would enable common carriers

ad libitum to defeat the very purpose of the statute in question. In the case of Smith *v.* Northern Pacific Railroad Company, 1 Int. Com. Com. Rep. 208, it was held that "The sale of 'Land Explorer's Tickets' and 'Settler's Tickets' at less than the reg-- ular rates charged to passengers at the usual ticket-offices, as practiced by the Northern Pacific Railroad Company, is un- just discrimination." And that "The rule under which pas- senger transportation should be conducted requires absolute equality of payment from all persons enjoying the same accom- modations."

Prior to the act of Congress above quoted, interstate com- merce traffic in this country was regulated by the principle of common law applicable to common carriers. There seems to be a conflict of authority as to whether or not, at common law, common carriers would be bound to make the same charges to all persons for the same service, the weight of authority in this country being in favor of equality of charges. See Interstate Commerce Commission *v.* B. & O. R. R., 145 U. S. 275–276. Perhaps, on account of such conflict, and further, for the reason that the several States were powerless to prevent unjust dis- crimination as to traffic going beyond their respective bounda- ries, Congress took the matter in charge with a view of prevent- ing unjust discriminations throughout the country.

It was contended by the able counsel for defendant in error in this case, that the transaction in question was tantamount only to a sale of tickets at wholesale, and that, under the ruling in the case last above cited, the act of Congress was not in- tended to ignore the principle that one can sell at wholesale cheaper than at retail. It will be seen from an inspection of that case, that the question involved therein was the legality of the sale of what is known as a "party-rate ticket"; that is, a ticket for the transportation of a number of persons from a place in one State or Territory to a place situate in another State or Territory at a rate less than that charged to a single individual for a like transportation on the same trip. There is no simi- larity in that respect between the present case and the one just cited. If, instead of issuing a single ticket for a company of ten or more persons, the common carrier had issued in that

case a number of tickets to a broker at such price as would have enabled him to have sold them to individuals at less than the established rate, and had used the term "party-rate ticket" as a device to evade the law, then we apprehend the ruling of the United States Supreme Court would have been entirely different; for the court in that case, on page 284, says, "The party-rate ticket, as it appears in this case, is a single ticket covering the transportation of ten or more persons, and would be much less available in the hands of a ticket-broker than an ordinary single ticket, since it could only be disposed of to a person who would be willing to pay two thirds of the regular fare for that number of people. It is possible to conceive that party-rate tickets may, by a reduction of the number for whom they may be issued, be made the pretext for evading the law, and for the purpose of cutting rates, but should such be the case, the courts would have no difficulty in discovering the purpose for which they were issued, and applying the proper remedy." This being a contract, therefore, not only declared unlawful by the statute, but made a penal offense by its terms, a suit for the breach thereof can not be maintained.

It is further contended on behalf of the defendant in error, that even if the contract is illegal, it is not *malum in se,* but *malum prohibitum,* and that he can recover back the money he paid the railroad. "A broker, or other agent, employed to carry out an illegal transaction, can not recover for losses incurred or disbursements made by him in the course of the transaction, if he was privy to the principal's unlawful purpose." Clark on Contracts, § 213. The same author, on page 494, quotes from Lord Kenyon, to the effect that, "There is no case to be found where, when money has actually been paid by one of two parties to the other upon an illegal contract, both being *participes criminis,* an action has been maintained to recover it back again." Some exceptional cases, however, are recognized by this author, and are undoubtedly sustained by good authority. These he groups as follows: "(a) Cases in which a *locus pœnitentiœ* remains, and while the agreement is unperformed money or goods delivered in furtherance of it are allowed to be recovered. (b) Cases in which the parties are not regarded as

being *in pari delicto*, as (1) where the party asking relief was induced to enter into the agreement under the influence of fraud or strong pressure, or (2) where the law which makes the agreement unlawful was intended for the protection of the party asking relief." This case falls within none of these exceptions. This is not an action to disaffirm an illegal contract and seeking to recover back from the defendants money had and received thereunder before its full execution. Upon the contrary, it is a suit for damages growing out of a breach of the contract. Instead, therefore, of being an effort to rescind the contract, it is really a proceeding to enforce it. Besides, it appears from the plaintiff's petition in this case that payment for these tickets was made, not to any of the defendant railroad companies, but to a railroad corporation in Florida, and it does not appear that the defendants have in hand, or have ever received, any portion of the fund. There is a very patent distinction between this case and the case of *Clark, Harrison & Co.* v. *Brown*, 77 *Ga.* 606. In that case it appears that the principal deposited money in the hands of his agents to be used for an illegal purpose, namely, the purchase of futures in pork and grain. It was there held: "He could not set up the illegal contract to recover profits realized thereunder, nor could the agents set up the illegal contract for the purpose of defeating a recovery by the principal of the money deposited with them, and which was held by them." The plaintiff in that case did not rely upon his illegal contract. He was not seeking to enforce the same; and hence the court very properly draws the distinction between that case and the previous rulings of this court on the subject of enforcing illegal contracts. It is true, in the case of *Western Union Telegraph Company* v. *Blanchard, Williams & Co.*, 68 *Ga.* 300 (6), it is held, that "Although a speculation in cotton futures may be an illegal contract, yet an agent who incurs expense or loss on behalf of his principal in carrying out such contract may recover the amount thereof from such principal." But this court has never adhered to that ruling. On the contrary, the principle decided in that case was virtually overruled in the case of *National Bank of Augusta* v. *Cunningham*, 75 *Ga.* 366; and in *Cothran & Co.* v. *Western Union Telegraph Company*, 83 *Ga.* 25.

It may seem a hardship in some cases to allow a party to insist upon his illegal contract as a reason why he should be relieved from his obligations thereunder.    The law, in refusing to enforce such contracts, has not in view the benefit of the litigants themselves, but questions of public policy, and the protection of the people against the violations of statutes enacted for the public good.

3. From the above we conclude that the petition in this case sets forth no legal cause of action, and that, therefore, the court erred in overruling the demurrer thereto.

*Judgment reversed.    All the Justices concurring, except Cobb, J., disqualified.*