[No. 7155.  Decided April 4, 1908.]

H. A. FISHER, *Appellant*, v. GREAT NORTHERN RAILWAY COMPANY, *Respondent*.[1]

COMMERCE—REGULATIONS—DISCRIMINATIONS—FOREIGN TRAFFIC— CARRIERS. The interstate commerce law, 34 Stat. L. p. 584, requiring the posting and publishing of freight rates and charges applies to shipments from a foreign country to be carried from the port of entry to any place in the United States.

SAME—DISCRIMINATORY CHARGES—AGREEMENTS VIOLATING SCHEDULE. When a freight rate has been fixed and properly posted and published by a carrier with reference to shipments regulated by the interstate commerce law, such rate controls the carrier's charges and lien without regard to a lesser rate agreed to by the carrier, as the latter would be unlawful and unenforcible.

[1]Reported in 95 Pac. 77.

SAME—BURDEN OF PROOF. The burden is upon the carrier to show that its shipping contract, fixing a lesser rate than its published schedule, violates the interstate commerce law and is unenforcible, where the carrier asserts the invalidity of the contract and seeks to enforce the higher rate.

COMMERCE — REGULATIONS — DISCRIMINATION—AGREEMENT IN VIOLATION OF INTERSTATE COMMERCE LAW—OCEANIC COMPETITION. Where a railroad's published schedule of rates and charges, posted pursuant to the interstate commerce law, fixed a rate of eighty-five cents per hundred pounds on canned goods from the port of S. in Norway to a station in this state, providing that the ocean rate procurable is such as to allow a minimum rate of seventy-five cents per hundred pounds for rail carriage from Atlantic seaboard ports, and provided further that, if the difference between the through rate and the rail line's minimum of seventy-five cents was less than the ocean proportion, the through rate will be the ocean proportion plus seventy-five cents per hundred pounds, an agreement by the carrier to make the through shipment at the rate of eighty-five cents per hundred pounds is not necessarily in violation of the interstate commerce law, although the best ocean rate procurable at the time was thirty-eight and seven-tenths cents per hundred pounds; and the same may be enforced against the carrier, in the absence of any evidence on its part showing that circumstances and conditions attending oceanic competition did not justify the lesser rate agreed upon; since the burden is upon the carrier to show that the agreed rate is unlawful, and since the rate from the port of entry to the point of destination may lawfully be less in the case of such oceanic competition than it is where the shipment originates in the United States; there being a distinction between such foreign and inland shipments in the application of the interstate commerce law (RUDKIN, J., dissenting).

Appeal from a judgment of the superior court for King county, Griffin, J., entered May 9, 1907, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action of replevin.   Reversed.

*Ira Bronson, D. B. Trefethen,* and *Loren Grinstead,* for appellant.

*L. C. Gilman (B. O. Graham,* of counsel), for respondent.

HADLEY, C. J.—This is an action in replevin, and involves a controversy concerning shipping rates, based upon a dispute

as to the application of the interstate commerce law. The agreed facts are, that the defendant railroad corporation files with the interstate commerce commission, at Washington, D. C., and prints and keeps open for public inspection, schedules of all the rates, fares, and charges for transportation between different points on its own lines and between points on the lines of any other carrier, by railroad or water, when a through rate has been established; and keeps copies of such schedules plainly printed in large type, for the use of the public, in two public places in every depot, station, and office by it conducted where passengers or freight are received for transportation, in such form that said schedules are accessible to the public and can be conveniently inspected. From the 19th day of May, 1906, continuously to the present time, the defendant has so filed, published, and posted for inspection a schedule of its tariffs in connection with Atlantic steamship lines operating from different ports in Europe, including the port of Stavanger, Norway, to Seattle, Washington. The said schedule names as a rate on canned goods from said Stavanger to Seattle, eighty-five cents per hundred pounds, and on cheese $1.31 per hundred pounds. The said schedule of tariffs also contains the following provision:

"The rates named herein will be protected only when freight is routed as ordered by a representative of the railroad companies parties hereto and when the ocean rate procurable is such as to allow rail carriers from Atlantic seaboard ports a minimum proportion of seventy-five ($.75) cents per hundred lbs. If the difference between the through rate published herein and the rail line's minimum proportion of seventy-five ($.75) cents per hundred lbs. is less than the ocean proportion, the through rate will be the ocean proportion plus seventy-five ($.75) cents per hundred lbs."

On or about the 20th day of August, 1906, and while said freight tariffs on canned goods and cheese were in existence and applicable to all shipments of canned goods and cheese from said Stavanger, Norway, to Seattle, the plaintiff applied to the defendant's authorized agent at Seattle for quotations

of rates upon canned goods from Stavanger to Seattle, and was verbally informed that the rate was eighty-five cents per hundred pounds, minimum thirty thousand pounds. The above verbal quotation was afterwards confirmed by letter from the agent to the plaintiff. The plaintiff accepted and relied on said quotation of eighty-five cents per hundred for canned goods, notified the defendant of such acceptance, and thereupon purchased in Stavanger, and ordered shipped to Seattle by the defendant's line and its connections, four hundred and eighty-three cases of canned goods, of the weight of thirty-eight thousand seven hundred and thirty-three pounds, and three cases of cheese of the weight of four hundred and sixteen pounds, without prepayment of any of the charges thereon. Said freight was routed as ordered by a representative of the defendant company, and carried by defendant and its connecting rail and water lines from Stavanger to Seattle. At the time the shipment was offered by the plaintiff and received by the defendant, the best ocean rate procurable was thirty-eight and seven-tenths cents per hundred pounds, which, when added to the rail carrier's minimum of seventy-five cents per hundred, according to the aforesaid posted and published condition, made a total tariff of one dollar, thirteen and seven-tenths cents per hundred on the canned goods. The published rate on the cheese was not affected by the condition, and remained at $1.31 per hundred. In addition to the above, the defendant paid sixty-one cents costs of import bill of lading, and $1.40 customs charges.

About the 6th day of December, 1906, the goods arrived at Seattle, with freight and customs charges due and unpaid thereon. The carriers of the shipment, other than the defendant, delivered the same to the defendant with freight charges unpaid thereon, and authorized the defendant to collect all freight charges legally due thereon. Upon the arrival of the goods in Seattle, the plaintiff tendered to the defendant at its office in Seattle the sum of $336.69, which was refused. At the time said tender was made, the defendant

offered to deliver the goods to plaintiff upon payment of $447.85, which the plaintiff refused to pay. The defendant retained possession of the goods under claim of carrier's lien thereon, until possession was taken from it by the plaintiff through the medium of this action. From the foregoing facts the court concluded that the defendant, at the time of the commencement of this action, was entitled to possession of the property by virtue of a carrier's lien amounting to the sum of $447.85, and also to a judgment for the return of the property, or in case the return thereof cannot be had, to a money judgment for said sum. Judgment was entered accordingly, and the plaintiff has appealed.

That the shipment in question, although made from a foreign country to a place in the United States, is subject to the interstate commerce law, is evident from the terms of the law. Section 1 of the act, 34 Stat. at Large, p. 584, provides, among other things, as follows:

"That the provisions of this act shall apply  .  .  .  to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad (or partly by railroad and partly by water when both are under a common control, management, or arrangement for a continuous carriage or shipment)  .  .  .  and also to the transportation, in like manner, of property  .  .  .  shipped from a foreign country to any place in the United States, and carried to such place from a port of entry either in the United States or any adjacent foreign country."

The shipment being subject to the operation of the law, it follows that the provisions in relation to the posting and publishing schedules of rates on such shipments must also apply. Section 2 of the act provides as follows:

"That every common carrier subject to the provisions of this act shall file with the commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate

14—49 WASH.

have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print and keep open to public inspection as aforesaid, the separately established rates, fares and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this act."

When a rate has been fixed and properly posted and published, within the meaning of the above provisions, it must prevail without regard to any agreement fixing a different rate. In *Southern R. Co. v. Harrison*, 119 Ala. 539, 24 South. 552, 72 Am. St. 936, 43 L. R. A. 385, the court said:

"Whatever may be the rate agreed upon, the carrier's lien on the goods is, by force of the act of Congress, for the amount fixed by the published schedule of rates and charges, and this lien can be discharged, and the consignee can become entitled to the goods, only by the payment, or tender of payment of, such amount. Such is now the supreme law, and by it this and the courts of all other states are bound."

The above language was adopted by the supreme court of the United States as expressing its own view of the law, in *Texas & Pac. R. Co. v. Mugg*, 202 U. S. 242, 26 Sup. Ct. 628. See, also, *Gulf etc. R. Co. v. Hefley*, 158 U. S. 98, 15

Sup. Ct. 802; *Texas & Pac. R. v. Abilene Cotton Oil Co.*, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553; *Texas & Pac. R. Co. v. Cisco Oil Mill*, 204 U. S. 449, 27 Sup. Ct. 358, 51 L. Ed. 562.

It is conceded that private contracts for transportation of interstate shipments are ineffective unless a carrier shall have failed to file and post a proper schedule. It is contended by appellant, however, that the schedule must in all respects comply with the provisions of the law before the public is bound by it; that the burden of proving such compliance is upon the carrier; that in the absence of proof of full compliance and of evidence demonstrating that a contract rate is unlawful, the contract is assumed to be valid. In the case of *Southern Pac. R. Co. v. Redding*, 17 Tex. Civ. App. 440, 43 S. W. 1061, a contract in essential respects like. the one before us was involved. It related to a shipment from a foreign port to an inland point, and, as in this case, the proportion of the through contract rate, allowed for the carriage from the port of entry to the destination, was less than the rates scheduled for freight originating at such port and carried to such destination. The Texas court said of the company making that contract as follows:

"By making the contract it necessarily affirmed the right to do so, and certainly. if it can release itself from its undertaking by proving that the contract was illegal, the burden is upon it to furnish such proof and to show, not simply that the contract may have been unlawful, but that it was necessarily so. In other words, it must exclude the existence of any circumstances or conditions which would have made the contract legitimate."

It was held that circumstances and conditions might exist which would make the contract legitimate, even under the application of the interstate commerce law; and for want of evidence showing that such circumstances did not exist, the contract rate was enforced. That decision by the state court of Texas was based upon the decision of the supreme court of the United States in *Texas & Pac. R. Co. v. Interstate Com-*

*merce Commission*, 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940. The opinion of the majority of the court in that case, written by Mr. Justice Shiras, is a very exhaustive one. While it was held that the entire commerce of the United States, foreign and interstate, is subject to the provisions of the act of Congress to regulate commerce, yet it was also clearly held that ocean competition may constitute dissimilar conditions, and that circumstances and conditions which exist beyond the seaboard of the United States may be legitimately regarded for the purpose of justifying a difference in rates charged by railroads with respect to import and domestic traffic. It was directly held that competition in ocean transportation is to be taken into consideration when goods have been imported on a through bill of lading from a foreign shipping point in determining whether the contract rate from the port of entry in the United States to the point of destination is a violation of the act. It was declared that the mere fact that the proportion of the through contract rate allowed for the carriage from the port of entry to the destination may be less than the rate scheduled for freight originating at the same place and carried to the same destination, does not necessarily render the lesser rate unlawful. The pronounced view of the court was that it must first be made to appear that the circumstances attending oceanic competition beyond the seaboard of the United States are not such as justify the lesser rate, before it can be held that such rate is unlawful. A clear distinction was thus drawn between the application of the law to oceanic commerce originating in a foreign country for importation to an inland point in the United States and that which is wholly inland and merely interstate. Three judges dissented, and strong reasons were urged by Mr. Justice Harlan and Mr. Chief Justice Fuller against making the distinction between the two classes of commerce. There is much convincing force in the views of the dissenting arguments, but the opinion of the majority constitutes the decision of the court, and inasmuch as the

question here involved is a Federal one, it must be treated by us in subordination to the views expressed in the decisive opinion. We are not advised that the said decision has been modified in any way by subsequent decisions. All the decisions of the same court cited by respondent relate to purely inland and interstate commerce, and in no way concern oceanic traffic. We therefore deem it to be our duty to follow that decision, as was done by the state court of Texas, and to apply the law as we understand, from the decision discussed, it should be applied to a case of foreign commerce requiring oceanic transportation to a United States port of entry, and thence by inland carriage from such port to the destination. Therefore the scheduled rate is not in itself conclusive as to this class of traffic, and inasmuch as there was no evidence showing that circumstances and conditions attending oceanic competition did not justify the lesser rate, thereby rendering it unlawful, it follows that it has not been demonstrated that the contract was unlawful.

The judgment is therefore reversed, and the cause is remanded with instructions to enter judgment in appellant's favor for the possession of the property, and awarding to respondent the amount tendered into court by the appellant.

FULLERTON, MOUNT, CROW, and ROOT, JJ., concur.

RUDKIN, J. (dissenting)—It seems to me that the conclusion reached by the majority of the court is neither warranted by the provisions of the act to regulate commerce nor supported by the authorities cited. Section 1 of that act expressly declares that its provisions shall apply to the transportation of property shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country. It is needless to say that the traffic here involved falls directly within this provision. Indeed, the appellant does not contend otherwise. Nor in my opinion does the court hold in the case of *Texas & Pac. R. Co. v. Interstate*

*Commerce Commission*, 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940, that the transportation of goods partly by water and partly by rail from a foreign country to any place in the United States is a mere matter of private contract between the carrier and the shipper. The court there held that dissimilarity of conditions may warrant a railroad company in carrying imports from a port of entry at a less rate than domestic goods, but this in my opinion falls far short of holding that the transportation of imports is a mere matter of private contract. In *Texas & Pac. R. Co. v. Interstate Commerce Commission*, *supra*, the court said:

"It would be difficult to use language more unmistakably signifying that Congress had in view the whole field of commerce [excepting commerce wholly within a state] as well that between the states and territories as that going to or coming from foreign countries."

In *Texas & Pac. R. Co. v. Abilene Cotton Oil Co.*, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, the court said:

"That the act to regulate commerce was intended to afford an effective means for redressing the wrongs resulting from unjust discrimination and undue preference is undoubted. Indeed, it is not open to controversy that to provide for these subjects was among the principal purposes of the act . . . And it is apparent that the means by which these great purposes were to be accomplished was the placing upon all carriers the positive duty to establish schedules of reasonable rates which should have a uniform application to all, and which should not be departed from so long as the established schedule remained unaltered in the manner provided by law."

If the act covers the whole field of commerce, as well that between the states and territories as that going to or coming from foreign countries, and its chief aim is to prevent unjust discrimination and undue preference by placing on the carrier the positive duty to establish schedules of reasonable rates which shall have a uniform application to all and which cannot be departed from so long as the established schedules remain unaltered in the manner provided by law, how can the

right of private contract exist without defeating the very objects that Congress had in view. ·While under the· decision in *Texas & Pac. R. Co. v. Interstate Commerce Commission, supra,* a railroad may discriminate between imports and domestic shipments where dissimilar conditions warrant such dis· crimination, it may not discriminate between different importers, and while the rate on imports may be less than the rate on domestic goods, the rates must be uniform as to each class. There must be no unjust discrimination or undue preference, and the schedule of such rates must be filed and published and can only be changed in the mode prescribed by law.

If there is any merit in the appeal before us, in my opinion it lies in the fact that the schedules posted and filed were not sufficiently definite and explicit to comply with the requirements of the law. But inasmuch as this question is not touched upon in the majority opinion, I will refrain from discussing it.