[No. 11730.   Department One.   September 26, 1914.]

SOUTHERN PACIFIC COMPANY, *Appellant*, v. FRYE & BRUHN, INCORPORATED, *Respondent*.[1]

CARRIERS—INTERSTATE COMMERCE—REGULATION — CONTRACTS—VALIDITY—BURDEN OF PROOF.   Notwithstanding that an interstate carrier is bound to collect the lawful published tariff rate, regardless of erroneous quotations by agents, and that contracts for shipments impliedly include the terms of the act to regulate commerce, an agreement by an interstate carrier to make a certain freight rate on interstate shipments is presumptively valid, in the absence of evidence to the contrary, and the burden is upon the company to show its invalidity as contrary to its published schedule of rates filed with the interstate commerce commission.

SAME—INTERSTATE COMMERCE—CONTRACTS—BY AGENTS—RATIFICATION.   The agreement of an interstate railroad agent to protect a double deck rate on shipments of sheep if single deck cars, scheduled at a higher rate, were accepted in lieu of the double deck cars ordered by the shipper, is ratified and cannot be questioned by the railroad company, if the published tariff authorized the contract, where the company actually protected the rate by making, upon demand, a refund of the excess rate, paid under protest at the time of the shipment.

CARRIERS—INTERSTATE RATES—PUBLISHED TARIFFS—CONSTRUCTION.   Under a railway freight tariff, published and filed with the Interstate Commerce Commission, reciting that shipments of sheep, when loaded in double deck cars, will be charged 170 per cent of the rate provided for single deck cars, but if the company cannot furnish double deck equipment, and shipments move in single deck cars, the rates provided for the latter will be charged, the company is not entitled to collect on the basis of single deck cars on a shipment

[1]Reported in 143 Pac. 163.

made in that class, where the shipper ordered the shipment in double deck cars and it was possible for the company to provide the latter class of cars.

Same—Rates—Ability to Furnish Cars—Evidence—Sufficiency. In such a case, the evidence fails to establish that the company could not furnish double deck cars, where it appears that, on the day of shipment, the company had enough double deck cars available to fill the order, located at from fifty to five hundred and fifty miles from the points of shipment, that the movement and use of such cars was not impracticable or unusual in railroad operation under such circumstances; that the company loaded such cars for other shippers on that day; and that, on the contract in question, there was a notation of the fact that double deck cars were ordered and single deck cars furnished for the convenience of the railroad company.

Same—Reasonableness. Although the reasonableness of an interstate tariff regulation may not be passed upon by a state court, a state court has power to determine the construction of such tariff regulation, when its jurisdiction is invoked by the carrier in an action involving the legality of contracts based thereon.

Same—Interstate Commerce—Contracts — Remedies — In Pari Delicto. A railroad company has no right of action to recover a refund of money paid to a shipper in pursuance of an agreement to protect him from freight charges for use of single deck cars when he had ordered double deck cars, on the theory that it was an illegal rebate from its published tariff rate, within the purview of the Interstate Commerce Act, since, in the event of its illegality, the parties would be *in pari delicto,* and courts will not lend their aid for the recovery of money voluntarily paid out on a contract fully executed and performed.

Appeal from a judgment of the superior court for King county, Pendergast, J., entered July 17, 1913, dismissing an action for money paid, after a trial on the merits to the court. Affirmed.

*Peters & Powell, Wm. D. Fenton, Ben C. Dey, and Kenneth L. Fenton,* for appellant.

*Higgins & Hughes (Hyman Zettler,* of counsel), for respondent.

Ellis, J.—The plaintiff is a common carrier, engaged in interstate commerce. The defendant is a corporation en-

gaged in the manufacture of packing house products, at Seattle, Washington. The action is in two counts, under the act of Congress to regulate commerce, approved February 4, 1887, to recover money paid by the plaintiff to the defendant which the plaintiff claims was, in effect, an illegal rebate on the legally established freight rates. The first count declares on a shipment of sheep which moved from Delano, California, to Seattle, Washington, on April 22, 1909, and demands $255.09, with interest; the second, on a shipment of sheep from Olig, California, to Seattle, on May 13, 1909, and demands $158.50 with interest. Both shipments were consigned and delivered to the defendant at Seattle. At the time of the shipments, the plaintiff's live stock tariffs over its lines from California points to Portland, Oregon, published and filed with the Interstate Commerce Commission as required by the act, under the heading "double deck cars," provided:

"Shipments of sheep, hogs, goats, and calves, when loaded in double deck cars, will be charged for at 170 per cent of the rate provided for single deck cars of same length. If company cannot furnish double deck equipment, and shipments move in single deck cars, the rates provided for the latter will be charged."

The defendant, through its agent at the points of origin, ordered double deck cars for both shipments in order to get the benefit of the lower rate. The plaintiff, however, loaded the sheep into single deck cars and charged and collected from the defendant, over its protest, the rates for such cars. On July 17, 1909, the defendant filed a claim with the plaintiff for the excess as an overcharge. On January 15, 1910, the plaintiff refunded the difference. It brought this action for the amounts so refunded, claiming an undercollection of the legal rate in those amounts.

By answer and stipulation as to certain facts, the allegations of the complaint were admitted, except that the defendant denied that there was any amount due on the shipments,

denied that the shipments in single deck cars and the original freight payments were made otherwise than under protest, and denied that the refund was made otherwise than in rightful settlement of its claim. At the trial, by permission of court, the defendant interposed a further affirmative defense to the effect that, on May 1, 1912, the Interstate Commerce Commission, in the case of *Carstens Packing Co. v. Southern Pac. Co.*, 22 I. C. C. 236, held the tariff in question unreasonable, and that, when double deck cars are ordered, only double deck rates should be charged, even though single deck cars were furnished; that, because of the voluntary payment by the plaintiff, the defendant abandoned any steps toward making application to the Interstate Commerce Commission for reparation; that the two-year statute of limitations prescribed for such application has expired, and it is now impossible to obtain such reparation from that body. By permission of the court, this affirmative matter was deemed denied.

We shall not attempt a detailed statement of the evidence further than to say we find it sufficient to establish the following facts: That double deck cars were ordered by the defendant and single deck cars were furnished for the convenience of the plaintiff; that, at the time the shipments were made, there was an agreement between the defendant and the assistant general freight agent of the plaintiff at Portland that, if the single deck cars were accepted, the plaintiff would protect the double deck rate; that, at the time of these shipments, there were many double deck cars within seven hundred or eight hundred miles of the points of shipment which could have been procured to fill the defendant's order, and that it was customary for railroads to move cars a much greater distance than that to supply orders. On the contracts of shipment themselves, there was a notation of the fact that double deck cars were ordered and single deck cars were furnished for the convenience of the railroad company. Depositions were introduced showing the number and lo-

cation of double deck cars in the state of California at the very dates of these shipments belonging to roads of the Harriman system, of which the plaintiff's road is a part. These show that, on April 22, 1909, there were nine of these double deck cars located at points from fifty to five hundred and fifty miles of Delano, the point of origin of the first shipment, for which seven double deck cars were ordered; and that on May 13, 1909, the date of the last shipment, there were five double deck cars located at points from fifty to three hundred and fifty miles from Olig, California, the point of origin of the last shipment, for which four double deck cars were ordered. It appears that these cars were loaded for other shippers on that day at other points, but the evidence clearly shows that there were many double deck cars belonging to the Northern Pacific Railroad Company at Portland, Oregon, which could have been secured to fill defendant's orders. That the filling of these orders with the required double deck cars was neither impossible nor impracticable, nor, in fact, a thing unusual under such circumstances in practical railroad operation, was too well established to admit of serious question.

The trial court made no formal findings of fact, but entered a judgment dismissing the plaintiff's complaint and awarding the defendant its costs. The plaintiff has appealed. The appellant's argument and the authorities which it cites are directed to the following general propositions:

(a) That, under the act to regulate commerce, a positive duty is imposed upon the carrier to collect, and upon the shipper to pay, the lawful tariff rate. This proposition is amply sustained by the following decisions: *Interstate Commerce Commission v. Brimson*, 154 U. S. 447; *Gulf, Colorado & Santa Fè R. Co. v. Hefley*, 158 U. S. 98; *Texas & Pac. R. Co. v. Mugg*, 202 U. S. 242; *Texas & Pac. R. Co. v. Abilene Cotton Oil Co.*, 204 U. S. 426; *Blinn Lumber Co. v. Southern Pac. Co.*, 18 I. C. C. 430.

(b) That, although an erroneous quotation or misstatement of a rate is made by an agent or officer of a carrier, the published rate on file with the Interstate Commerce Commission is the only lawful rate, and must be paid by the shipper and collected by the carrier. This is amply supported by most of the decisions above cited, and also the following: *Poor Grain Co. v. Chicago, B. & Q. R. Co.*, 12 I. C. C. 418; *Forster Bros. Co. v. Duluth, S. S. & A. R. Co.*, 14 I. C. C. 232; *Baldwin Sheep & Land Co. v. Columbia R. Co.*, 58 Ore. 285, 114 Pac. 469; *Savannah, F. & W. R. Co. v. Bundick*, 94 Ga. 775, 21 S. E. 995; *St. Louis, I. M. & S. R. Co. v. Wolf*, 100 Ark. 22, 139 S. W. 536; *Schenberger v. Union Pac. R. Co.*, 84 Kan. 79, 113 Pac. 433, 33 L. R. A. (N. S.) 391.

(c) That every contract or agreement under which a shipment is moved impliedly includes the terms of the act to regulate commerce, and anything in such contract or agreement contrary to that act is void in that the parties contract with reference to the law. This proposition is supported by the following decisions: *New York, N. H. & H. R. R. Co. v. Interstate Commerce Commission*, 200 U. S. 361; *Armour Packing Co. v. United States*, 209 U. S. 56; *Chesapeake & O. R. Co. v. Standard Lumber Co.*, 174 Fed. 107; *Southern R. Co. v. Harrison*, 119 Ala. 539, 24 South. 552, 72 Am. St. 936; *Raleigh & G. R. Co. v. Swanson*, 102 Ga. 754, 28 S. E. 601, 39 L. R. A. 275; *Bullard v. Northern Pac. R. Co.*, 10 Mont. 168, 25 Pac. 120, 11 L. R. A. 246; *Fitzgerald v. Fitzgerald & Mallory Const. Co.*, 41 Neb. 374, 59 N. W. 838; *Fitzgerald v. Grand Trunk R. Co.*, 63 Vt. 169, 22 Atl. 76, 13 L. R. A. 70; *Fisher v. Great Northern R. Co.*, 49 Wash. 205, 95 Pac. 77.

From these propositions, the appellant concludes that the arrangement or understanding between the respondent and the agent of the appellant to protect the rate quoted and relied on by the respondent did not and could not relieve the carrier of its legal duty to collect, or the shipper of its legal

obligation to pay, the lawful tariff rate.  It is obvious that every one of the foregoing propositions may be conceded, and yet the conclusion will not follow, unless the rate quoted and which the agent agreed to protect was an unlawful rate.  The appellant's action is based upon the assumption that the agreement to protect the double deck rate and the payment of the refund were illegal; that is, that the original single deck rate collected, and not the double deck rate, was the true tariff rate.  If this assumption is incorrect, the judgment must be affirmed.  Our inquiry must start with the contrary assumption.  In the absence of evidence that a contract rate is unlawful, the contract is assumed to be valid.

"An agreement may involve some matter or purpose which is illegal, and therefore renders it void of legal effect as a contract.  The general presumption of law in favor of validity, casts the burden of establishing illegality as a fact upon the party asserting it."  Leake, Contracts (6th ed.), p. 515.

The burden was upon the appellant to show that the agreement fixing the rate to which payment was actually adjusted by the refund, was contrary to its published schedule, and therefore violated the interstate commerce act.  *Fisher v. Great Northern R. Co., supra.*  If the published tariff authorized the contract as made, the agent's authority to make the contract cannot be questioned.  The contract was ratified, so far as it legally could be ratified, by the appellant when it actually protected the double deck rate by paying the refund.

The published tariff, upon which the appellant places its sole reliance, after providing the lower rate for double deck cars, provides:

"If the company *cannot* furnish double deck equipment *and* shipments move in single deck cars, the rates provided for the latter will be charged."

We have emphasized the words which must control the meaning of this provision.  We shall assume that the appellant might have established, by publication in compliance

with the law, any tariff that it saw fit, and that such tariff would furnish the only legal rate so long as it remained uncanceled or unmodified by an order of the Interstate Commerce Commission. On this assumption, which is clearly sustained by the authorities cited as establishing the appellant's propositions which we have designated (a), (b), and (c), it is manifest that the appellant, by its published tariff, might have provided either (first) that, if double deck cars are ordered and the carrier for its own convenience or for any other reason *does not* furnish them, but furnishes the single deck cars instead, then the single deck rates will be charged; or (second) that, if double deck cars are ordered and the carrier *cannot* supply them, but supplies single deck cars instead, then the single deck rate will be charged. The whole question is, which of these two tariffs did the appellant actually adopt and publish. The difference is not only obvious but vital. The tariff here involved was clearly of the latter kind. The statement is clear and direct that, if the company *cannot* furnish double deck equipment *and*—note the conjunctive—shipments move in single deck cars, the rates provided for the latter will be charged. There is nothing ambiguous, uncertain, or involved in this sentence. It furnishes nothing upon which to base the appellant's assumption that, where the double deck cars ordered can be furnished, but the shipments move in single deck cars merely for the convenience of the railroad company, the higher rate will be charged. There is nothing to indicate that the word "cannot" is used otherwise than in its ordinary sense. The word "cannot," as defined in Webster's New International Dictionary, means "not able." It follows, therefore, that, before the railroad company will be entitled to charge the higher rate under this tariff, it must show that it could not furnish the single deck cars. This the evidence wholly failed to establish. The exact question here involved, so far as we are advised, has never been passed upon by any court of last resort save one. In *Joynes v. Pennsylvania R. Co.*, 234 Pa.

321, 83 Atl. 318, the supreme court of Pennsylvania was confronted with a situation the exact analogue of that here presented. In that case, the published tariff was as follows:

"The following estimated weights will apply in cars where actual scale weights cannot be ascertained: . . . Potatoes, white or sweet (in barrels) when it is practicable for agents to weigh same, will be charged at actual weight; but when it is not practical to weigh same, the following estimated weights will govern: Sweet potatoes,—when shipped in common or truck barrels, per bbl., 170 pounds. White potatoes,—when shipped in common or truck barrels, per bbl., 180 pounds."

During the years 1900 to 1905, inclusive, the plaintiff in that case shipped some 800 cars of Irish and sweet potatoes, all of which were consigned to him at the defendant's produce yards at Pittsburgh. Instead of actually weighing the potatoes, the defendant railroad company used the tariff estimated weights and collected corresponding freight charges. The shipper brought an action to recover the difference between the amount which should have been charged if the potatoes had been weighed, and the amount actually collected on the estimated weights. The evidence tended to show that the potatoes could have been weighed by the railroad company, though in most instances either by the inconvenient method of hand scales or by weighing at points other than the point of shipment while in transit or at the yards in Pittsburgh. The court, in affirming a recovery by the shipper of the amount of the overcharge, held that, since there was evidence submitted sufficient to justify the jury in finding that the potatoes could have been weighed, the tariff providing for estimated weights had no application, although the potatoes actually moved under that provision. The court said:

"The official tariff stipulated that when it was 'practicable' for agents to weigh potatoes they should be charged for at actual weight, but when it was not 'practical to weigh the same,' then estimated weights according to the schedule were

to govern; and that "estimated weights will apply in cases where actual scale weights cannot be ascertained.' The significant words used are thus defined in Webster's New International Dictionary: 'Practicable, that may be practiced or performed; capable of being put into practice, done or accomplished; feasible. Practical, syn.—see practicable.' The bill of lading and the printed tariff taken together indicate that these words were used in their ordinary sense; they did not require any particular or elaborate construction on the part of the trial judge. He left it to the jury to say under the evidence whether the company could have accomplished the taking of the actual weight of the potatoes— whether it was feasible for them to have ascertained their actual weight."

It is obvious that the tariff here in question is even less open to the construction contended for by the appellant than that before the court in the *Joynes* case. It is also obvious that the evidence in that case was no more conclusive of the ability of the railroad company to weigh the potatoes than it was in this case of the ability of the appellant to furnish the single deck cars. The tariff in both instances being plain and unambiguous, there being nothing in either case to indicate a technical meaning in the words used, nor evidence offered in either case to show that in practical railroading words so used were understood otherwise than in their ordinary sense, the question presented was one of fact and not of law. The appellant having come into court invoking its jurisdiction to determine its rights under a contract of which it claims its published tariff rate was one of the implied terms, it is incumbent upon this court to determine the true meaning of the words used in the tariff. We hold, as did the Pennsylvania court, that the published tariff did not authorize the collection of the higher rate under the facts shown by the evidence.

Against this view, the appellant advances, as a fourth proposition, that the determination of the reasonableness of a rule or regulation in a tariff is within the exclusive juris-

diction of the Interstate Commerce Commission, and a state court is without jurisdiction to pass upon that question, or even to consider it. This, also, as a general rule must be conceded. *Texas & Pac. R. Co. v. Abilene Cotton Oil Co.,* 204 U. S. 426; *Southern R. Co. v. Tift,* 206 U. S. 428; *Baltimore & Ohio R. Co. v. United States ex rel. Pitcairn Coal Co.,* 215 U. S. 481; *Robinson v. Baltimore & Ohio R. Co.,* 222 U. S. 506; *United States v. Pacific & A. R. & Nav. Co.,* 228 U. S. 87; *Simpson v. Shepard,* 230 U. S. 352.

In reaching the conclusion to which we are impelled by the plain words of the tariff itself, we have not passed upon nor even considered the reasonableness of that tariff nor of any rule or regulation which it promulgates. We have assumed that any tariff which the appellant might have seen fit to file and publish would, *pro hac vice*, be held reasonable and legal until canceled by the commission. We have done no more than pass upon the meaning of the contracts submitted as the basis of the appellant's two causes of action. If we cannot do this, the action should have been dismissed *in limine.* In its ultimate, the appellant's position amounts to this: that it may invoke the jurisdiction of a state court seeking to recover a balance which it claims to be due upon a contract of which its published rate forms an integral part, but that the court has no jurisdiction to determine or even to inquire what that published rate is, and must accept as final the appellant's assertion as to the meaning of the plain and simple words used in the published tariff itself. No authority cited so holds and we have found none so holding. In the absence of authority compelling to that conclusion, we decline to accept it.

The respondent advances another consideration which it claims precludes a recovery of the money refunded. It urges that, even if it be conceded that the refund was actually illegal and that the rate first collected was the legal rate, it would not follow that the appellant can recover in this ac-

tion. There was no evidence of a mistake, either of fact or law, on the part of the appellant's agent when he agreed to protect the double deck rate, nor any evidence of mistake on the appellant's part when it performed that agreement by adjusting the payment to that rate and made the refund. Presumably the appellant knew of the illegality of its action (assuming that it was illegal) then as well as now. Nothing to the contrary was either alleged or proved. Both parties to the contract actually knew the published tariff rate, and both are presumed to have known the law. The parties were *in pari delicto*. The law is well settled in this state, as in other jurisdictions, that in no case will the court lend its aid to the enforcement of an illegal agreement. A party cannot recover in a case in which he must disclose an illegal agreement as the groundwork of his claim. *Stirtan v. Blethen*, 79 Wash. 10, 139 Pac. 618; *Reed v. Johnson*, 27 Wash. 42, 67 Pac. 381, 57 L. R. A. 404; Clark, Contracts, § 213; Leake, Contracts (6th ed.), p. 564. It is equally well settled that, where an illegal agreement has been fully executed and performed by the payment of money, the court will not lend its aid for the recovery of the money so paid. *Mackintosh v. Renton*, 3 Wash. Terr. 431, 19 Pac. 144; *Equitable Life Assur. Soc. v. Wetherill*, 127 Fed. 947; Pollock, Contracts, p. 332.

"After the execution of the illegal contract or purpose money paid under it, whether as the consideration or in performance of the promise, cannot be recovered back; for the parties are then equally delinquent, and the rule applies that '*in pari delicto melior est conditio possidentis.*'" Leake, Contracts (6th ed.), p. 567.

"This rule is expressed in the maxim, '*In pari delicto potier est conditio defendentis;*' that is to say, where the parties are equally in fault the condition of the defendant is the better. The law, in such a case, will leave the parties where it finds them. 'There is no case to be found,' said Lord Kenyon, 'where, when money has been actually paid by one of two parties to the other upon an illegal contract, both being

*participes criminis,* an action has been maintained to recover it back again.' There are some exceptional cases, however, to which this maxim does not apply, cases in which a man may be relieved from an illegal agreement. These may be grouped as: (a) Cases in which a *locus poenitentiae* remains, and while the agreement is unperformed money or goods delivered in furtherance of it are allowed to be recovered. (b) Cases in which the parties are not regarded as being *in pari delicto,* as (1) where the party asking relief was induced to enter into the agreement under the influence of fraud or strong pressure, (2) where the law which makes the agreement unlawful was intended for the protection of the party asking relief." Clark, Contracts, pp. 493, 494.

In the case before us, the contract has been fully performed and the refund paid. The appellant has sued for its recovery. Its case does not fall within either of the exceptions noted in the above quotation. The recent case of *Cleveland, C. C. & St. L. R. Co. v. Hirsch,* 204 Fed. 849, presents the precise question here involved. The railroad company brought suit to cancel a lease and to recover rentals for the past use of premises which it had leased to the defendant shipper. It alleged that the rent reserved in the lease was nominal, and that the transaction was a subterfuge covering a rebate to the shipper from the legal tariff rates chargeable upon freight shipped by the defendant. The bill alleged that the excess of rental value over the rent reserved for the years 1906 to 1909, inclusive, was much more than the total revenue derived by the railroad company from the defendant's shipments, and averred,

"That the effect of the agreement was that, instead of the company receiving from Hirsch the regular published tariff rates for the transportation of his freight, it has in fact been paying to Hirsch a large bonus for shipping goods over its lines, and that Hirsch was so accorded an unreasonable preference and advantage over all other persons shipping over its lines, and that all other persons engaged in the same business in the city of Cincinnati were subjected to 'an undue and unreasonable prejudice or disadvantage.'"

The lower court dismissed the bill. The circuit court of appeals, upon appeal, held that the transaction was illegal, that the lease should be canceled in so far as it provided for a future term by renewal, in that relief may be had against illegal contracts so far as they are executory, but refused to grant a recovery of the rents paid by the past illegal rebates. The court said:

"Whatever rental value was given to Hirsch as a concession upon freight rates or otherwise must be treated the same as if its equivalent had been paid to Hirsch in money; and it is not claimed, as plainly it could not be, that the aid of a court could be invoked to recover cash payments of that character. *Equitable Life Soc. v. Wetherill*, 127 Fed. 947, 951, 62 C. C. A. 579. As respects the excess in rental value over the rent reserved, the contract must be regarded as acquiesced in and fully performed, at least up to the time of the beginning of the suit."

No reason has been suggested why the same result should not follow in the case before us, and we can conceive of none. This view does not leave the prohibitions of the interstate commerce act without sanction. They still have the sanction of a criminal prosecution to which either or both parties to such a transaction would be liable.

We have examined with some care all of the authorities cited by the appellant. They are to the effect that any shipping contract deviating from the legally published rate is void and cannot be made the basis of a defense in a suit to collect the legal rate. None of them holds that a party who has voluntarily paid money in the performance of such a contract can recover it after the contract has been fully executed by performance on both sides. Some of them clearly imply the contrary. See, especially: *Chesapeake & O. R. Co. v. Standard Lumber Co.*, 174 Fed. 107; *Raleigh & G. R. Co. v. Swanson*, 102 Ga. 754, 28 S. E. 601, 39 L. R. A. 275; *Fitzgerald v. Grand Trunk R. Co.*, 63 Vt. 169, 22 Atl. 76, 13 L. R. A. 70.

The respondent claims that the Interstate Commerce Commission has, by its rulings, both before and after the shipments here in question, recognized the principle that, if cars of a given character are offered at a given published tariff rate, and such cars are ordered but cars of a different kind for which a different rate is specified are furnished, the rate specified for the cars ordered and not that specified for the cars actually furnished is the legal rate applicable. The following decisions are cited as sustaining this claim: *Pacific Purchasing Co. v. Chicago & N. W. R. Co.*, 12 I. C. C. 549; *General Chemical Co. v. Norfolk & W. R. Co.*, 15 I. C. C. 349; *Kaye & Carter Lum. Co. v. Minnesota & I. R. Co.*, 16 I. C. C. 285; *Hanna Coal Co. v. Northern Pac. R. Co.*, 16 I. C. C. 289; *Jobbins v. Chicago & N. W. R. Co.*, 17 I. C. C. 297; *Noble v. Baltimore & O. R. Co.*, 22 I. C. C. 432; *Yorke Furniture Co. v. Southern R. Co.*, 162 N. C. 138, 78 S. E. 67. As applying this principle where double deck cars are ordered and single deck cars are furnished, respondent cites: *Corn Belt Meat Producers' Ass'n v. Chicago, B. & Q. R. Co.*, 17 I. C. C. 533; *Carstens Packing Co. v. Southern Pac. Co.*, 23 I. C. C. 236.

It is urged that this principle furnished a legal basis for the voluntary refund in question as an overcharge. *In re Accrual of Cause of Action*, 15 I. C. C. 201, 204. Though much of the briefs on both sides is devoted to this question, and the trial court seems to have based his decision on this ground, we prefer to base our decision on the grounds hereinbefore discussed.

In conclusion, therefore, we say, *first*, that, if we are permitted to pass upon the meaning of the appellant's tariff as published, we hold that the agreement to protect the double deck rate conformed to it and hence was not invalid; *second*, that, if we are precluded from passing upon the meaning of the appellant's published tariff, but must accept as final appellant's claim that the contract was illegal, then we hold

that the contract having been fully executed, there can be no recovery of the money voluntarily paid by the appellant thereunder.

The judgment is affirmed.

CROW, C. J., GOSE, MAIN, and CHADWICK, JJ., concur.