## UNITED STATES v. STANDARD OIL CO.

(District Court, N. D. Illinois. January 3, 1907.)

1. CARRIERS—INTERSTATE COMMERCE—CONSTRUCTION OF STATUTE PROHIBITING REBATES.

The purpose of Congress in the enactment of Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599], known as the "Elkins Law," was to secure uniform freight rates to all shippers, and its provisions are violated by the giving or receiving of any rebate or concession whereby any property shall be transported at a less rate by any interstate carrier than that named in the tariffs published and filed by such carrier, whether by direct agreement between shipper and carrier or indirectly by "any device whatever"; and where a railroad company has published and filed a schedule of rates on interstate shipments to points beyond its own line said section applies to such rates equally with those between points on its own road.

2. SAME—REBATES RECEIVED BY CONSIGNEE.

A consignee, no less than the consignor, is chargeable with a violation of section 1 of the Elkins law of February 19, 1903 (32 Stat. 847, c. 708 [U. S. Comp. St. Supp. 1905, p. 599]), by receiving rebates or concessions from the published tariffs of an interstate carrier through the cancellation of terminal charges at the point of destination which form a part of the tariffs as so published.

3. SAME—STATUTE—TIME OF TAKING EFFECT.

The joint resolution of Congress approved June 30, 1906, providing that the rate law of June 29, 1906 (34 Stat. 584, c. 3591), "shall take effect and be in force sixty days after its approval by the President of the United States," was ineffective to prevent such law from going into effect in accordance with its terms on the date of its approval by the President, which was the preceding day.

4. STATUTES—EFFECT OF REPEAL OF PENAL STATUTE—STATUTORY RULE OF CONSTRUCTION.

Rev. St. § 13 [U. S. Comp. St. 1901, p. 6], which provides that "the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability," was not an attempt by the Congress which enacted it to curtail the authority of succeeding Congresses by limiting in advance the effect to be given to their enactments, but was the substitution of a new rule of construction to be observed by the courts with respect to statutes to be thereafter enacted which is to be followed until abrogated by some later Congress; and under it the repeal of a penal statute extinguishes no penalties previously incurred

thereunder in the absence of an express extinguishing clause in the repealing act.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, § 368–370.]

5. CARRIERS—ACT REGULATING INTERSTATE CARRIERS—EFFECT OF REPEAL OF PRIOR STATUTES.

Section 10 of the rate law of June 29, 1906 (34 Stat. 595, c. 3591), which provides that "all laws and parts of laws in conflict with the provisions of this act are hereby repealed, but the amendments herein provided for shall not affect causes now pending in courts of the United States, but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law," was not intended to relieve offenders under the old law from subsequent indictment and prosecution for such offenses, while leaving those previously indicted subject to punishment, but merely to prescribe the rule of procedure which should control in pending causes, and in view of Rev. St. 1871, § 13 [U. S. Comp. St. 1901, p. 6], must be so construed.

6. SAME—INDICTMENT FOR RECEIVING REBATES.

An indictment for violation of section 1 of the Elkins law of February 19, 1903 (32 Stat. 847, c. 708 [U. S. Comp. St. Supp. 1905, p. 599]), for giving or receiving rebates, need not allege that the carrier's published rate was a reasonable rate, nor set out its tariffs in full, it being sufficient to aver that a certain named rate was in force between designated points as shown by the published tariffs.

7. SAME.

An indictment for receiving rebates in violation of section 1 of the Elkins law of February 19, 1903 (32 Stat. 847, c. 708 [U. S. Comp. St. Supp. 1905, p. 599]), which charges that there was an arrangement between several carriers having connecting lines for the continuous transportation of property over such lines between certain points, and that the lowest total rate as shown by the published tariffs of said several carriers was a certain sum per hundred pounds on a particular product, but that such product was transported for defendant at a lower rate, is bad, in that it does not negative the existence of a joint through rate lower than the total of the local rates.

On Demurrers to Indictments.

Edwin W. Sims, U. S. Atty., and James H. Wilkerson, Special Asst. U. S. Atty.

John S. Miller and Alfred D. Eddy, for defendant.

LANDIS, District Judge. These prosecutions are for alleged violations of section 1 of the act approved February 19, 1903, known as the "Elkins Law." Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]. The charge is that the defendant obtained the transportation of its property by various railway companies at rates less than those named in the carriers' published schedules. The offenses are alleged to have been committed prior to the enactment of the law approved June 29, 1906, known as the "Rate Law." Act June 29, 1906, c. 3591, 34 Stat. 584. The indictments were returned August 27, 1906.

I shall consider first the defendant's contention that the Elkins law did not prohibit a shipper from taking directly from a carrier a less rate than the published tariff; the defendant's claim being that the purpose of the law was merely to prohibit the parties from resorting to indirect methods, or inventing fraudulent devices to obtain preferential treatment. Now, until this argument was advanced here, the

court had supposed that everybody agreed that what Congress was trying to do was to secure uniform freight rates, and that the various prohibitions and penalties were imposed to accomplish that result. I had never heard an intimation to the contrary from any quarter; and have heard nothing in this argument to change the court's mind on this proposition. It is written in every section and line of the law that the thing sought by Congress was a fixed rate, absolutely, unvaryingly uniform, to be adhered to until publicly changed in the manner provided by law. The thing prohibited was the departure from that rate by any means whatsoever, whether direct between the parties or indirect by the employment of the most deviously circuitous subterfuge.

It is also urged by the defendant that, to require a shipper to adhere to a fixed published rate, defeats the ultimate object of the interstate commerce legislation, that object being the transportation of property for a reasonable compensation. The court is unable to see that this result follows. What Congress wanted to bring about was reasonable rates for all shippers, not simply for some shippers; and Congress knew that as an essential prerequisite to this preferences would have to be abolished. To abolish preferences, the law provides that the published rate shall be the only lawful rate. This does not mean that a rate once fixed and published shall never be changed, but it does mean that, when the change is made, it must be in the way provided by law, namely, by publication, to the end that the new rate may be available to all shippers at the same time, on equal terms.

Another point urged is that at least some of the indictments are bad because they allege that the defendant procured its property to be transported for less than the published rate from or to points beyond the carrier's own line; the argument being that the interstate commerce law requires the carrier only to publish rates for the transportation of property between points on its own road. This means that if a railway company, owning a road extending from Chicago to Springfield, Ill., and connecting therewith a line extending to Memphis, Tenn., should, by some sort of arrangement with such connecting line, equip itself to transport property from Chicago to Memphis, and should thereupon publish a rate showing its charges for such transportation, it is under no obligation to adhere to such published rate, but is at liberty to extend such preferential treatment as business expediency may seem to require. The court does not understand this to be the law. The shipping public is no more concerned with the question of whether the carrier owns the roadbed through to destination than it is with the question whether the carrier owns the car in which the property is transported. In such case the law regards such carrier so publishing its rate as thereby announcing that it has facilities for the transportation of property between the points mentioned in the schedule. Whether part of the distance is covered by lease, license, or some species of traffic arrangement is wholly immaterial. The rate once published, until publicly changed according to law, is no less binding upon all parties than it would be if the carrier owned outright the entire line.

The storage charge refund indictments are attacked by the defendant. There the allegation is that the published freight tariffs of the

148 F.—46

Lake Shore & Michigan Southern Railway Company showed that the carrier would impose a certain charge for the storage of shipments of petroleum after their arrival at Chicago; that a quantity of oil product was shipped from Whiting, Ind., to the Standard Oil Company at Chicago, and remained in the custody of the railway company until a substantial claim had accrued in favor of the carrier on account of such storage; and that the debt was canceled as a concession or rebate to the Standard Oil Company in respect of the transportation of the property. The law requires the published tariff to show everything in the way of terminal regulations which in any way affects the cost of the service rendered by the carrier, and such published terminal charge is no less binding on the parties than is the tariff specified for the transportation. The defendant challenges these indictments because it does not appear that the Standard Oil Company was the shipper, but was only the consignee. I do not understand that the law is operative only on consignors who, as such, would, in the very nature of things, have little, if any, interest in the question of such terminal charges as are mentioned in these indictments.

It is contended in behalf of the United States that the act of June 29, 1906, did not go into effect until after these indictments were returned. The pertinency of this proposition will appear hereafter. It is urged that this postponement was effected by the adoption of the joint resolution by Congress, approved June 30, 1906. That resolution provides that the rate law "shall take effect and be in force sixty days after its approval by the President of the United States." Of course, the purpose of this resolution is obvious. But it was wholly ineffective until approved by the President. This occurred on June 30th. And by its own terms the act became effective upon its approval by the President one day before. Plainly, therefore, on June 30th the resolution was powerless to postpone that which had already occurred on June 29th. While possibly on June 30th the resolution might operate to suspend the act for a period of time (and as to this I express no opinion), the questions presented by the demurrers to these indictments are to be determined as if a postponement or suspension of the act had not been attempted.

This brings us to what the court esteems to be the real question involved in the pending controversy. For the United States, it is conceded that under common-law rules of construction the repeal of a penal statute operates to wipe out all offenses against such repealed law, unless there is a statutory provision expressly authorizing their future prosecution. But it is denied that the act of June 29th repealed section 1 of the Elkins law, and it is maintained that, even if it were so repealed, offenses against the Elkins law are kept alive for future prosecution by section 13 of the Revised Statutes, enacted in 1871 [U. S. Comp. St. 1901, p. 6], which provides:

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

This law has been attacked here as an unwarranted attempt by the Congress that enacted it to curtail the authority of succeeding Congresses by limiting in advance the effect to be given to their enactments. Now, under our Constitution each Congress is the equal, in point of power, of any predecessor or successor. Therefore no Congress has authority to draw in the boundaries of the legislative domain to the embarrassment of any other Congress. But, as I read section 13, this is not attempted. It is rather the substitution of a new rule to be observed by the courts in the construction of statutes thereafter to be enacted. It seems to me that such new rule is no more an impairment of the legislative power of succeeding Congresses than was the previously existing common-law rule an impairment of the power of preceding Congresses. That Congress had the constitutional power to make the change is plain. That any succeeding Congress may abrogate the new rule and restore the old rule is equally plain. That, until such old rule is restored, each succeeding Congress intends that the courts shall be guided by the new rule in giving effect to their enactments, seems to me beyond question.

But for the defendant it is urged that section 10 of the rate law contains a provision which expresses the intention of the Congress that enacted that section to pardon all offenders against the repealed Elkins law, except as to those offenses upon which indictments had been returned prior to June 29, 1906, the date of the approval of the rate law. The language of section 10 (34 Stat. 595) is:

"That all laws and parts of laws in conflict with the provisions of this act are hereby repealed, but the amendments herein provided for shall not affect causes now pending in courts of the United States, but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law."

The contention of the defendant is that this provision was the enactment by Congress of its own saving clause, and that, therefore, section 13 cannot be held to apply here, because of the common-law rule providing that:

"Specific provisions in a statute relating to a particular subject must govern in respect to that subject as against general provisions in other parts of the law which might otherwise be broad enough to include it."

The theory upon which the defendant insists this rule should control is stated in State v. Showers, 34 Kan. 269, 8 Pac. 474, relied upon by defendant, as follows:

"The question as to what should be repealed and what saved was before the Legislature. It had the entire subject-matter thereof under consideration, and evidently intended to cover the entire ground; and evidently intended that nothing should be repealed except what it expressly repealed, and that nothing should be saved except what it expressly stated should be saved. It expressly saved some things; therefore, it must be inferred that it intended to save no others."

The defendant further maintains that the substance of the saving clause in section 10 respecting "causes now pending" was fully embraced within section 13; that, presumably, the Congress that enacted section 10 was familiar with section 13, and it is argued that to apply section 13 here, as authorizing the prosecution of an offense upon

which an indictment had not been returned prior to June 29th, and which was, therefore, not a pending cause when the rate law became operative, would be to deny to the saving clause in section 10 any effect whatever; the defendant's position being that that clause, by saving only pending causes, exhibits the will of Congress to extinguish all other offenses.

Of course, this court will not assume that Congress enacted section 10 in ignorance of section 13. On the contrary, it will be presumed that they were familiar with that section, and it must also be presumed that they knew what meaning had been given to it and to another saving clause like unto the one in section 10 when, in the case of Lang v. United States, 133 Fed. 201, 66 C. C. A. 255, decided two years before section 10 was adopted, the Circuit Court of Appeals of this circuit was appealed to by a convicted man to release him from imprisonment, for the same reason urged by defendant against the indictments in the pending controversy. There, as here, the indictment was returned after the repeal of the law which the defendant was accused of having violated. The repealing statute contained the following so-called special saving clause:

"Nothing contained in this act shall affect any prosecution or other proceeding, criminal or civil, begun under any existing act hereby amended, but such prosecution or other proceeding, criminal or civil, shall proceed as if this act had not been passed.

"All acts and parts of acts inconsistent with this act are hereby repealed."

It was argued that, inasmuch as this clause specifically authorized the future prosecution of "proceedings begun," Congress must be presumed to have thereby expressed its intention that nothing else should be prosecuted. The court, however, affirmed the judgment of conviction, each member of the court writing a separate opinion; Judge Jenkins dissenting from the judgment of the majority. Judge Grosscup, writing for affirmance, construed the special saving clause as if it read "proceedings heretofore begun or hereafter to be begun." He says:

"It was not the purpose of Congress in the employment of the word 'begun' in the connection here used, to provide that there should be no prosecutions under the old statute unless they had been already begun. Congress, presumably, was looking to the future, as well as the past. It meant that in the matter of importations of this character, there should be no interim of noncriminality. The amendatory statute only enlarged and tightened the preceding statute. No prosecutions could be based on the amendatory statute for acts done prior to its enactment; what Congress meant in the section preserving the right to prosecute under the statute was, that no prosecutions begun under that statute, whether they were then pending, or should thereafter be brought, should lapse by reason of this effort to enlarge and tighten the hold of the government upon this class of importations. It is to carry out this purpose that the word 'begun' is employed, merely as a connective to identify a prosecution pending or to be brought, with the statute under which it is brought."

Concurring with Judge Grosscup, Judge Baker held that section 13 was not "an attempt to tie the hands of succeeding Congresses," but rather a command to "the courts to treat a repealed statute as still remaining in force for punishment of violations, unless the courts shall find that the repealing statute expressly provides that such repealed act shall not sustain any prosecution for its violation"; that therefore

section 13 applied, inasmuch as the special saving clause was silent respecting "the fate of those unconvicted violators of the original act against whom prosecutions had not been begun by March 3, 1903" (that being the date of the repealing act).

He further says:

"If section 13 is in force in its entirety, it is the court's duty to apply the rule of interpretation therein laid down and to treat the repealed act as being alive for the purpose of sustaining any proper prosecution for the enforcement of its penalties, unless the amendatory and enlarging act be found to contain an express provision for the forgiveness of the unconvicted. There is no pretense that the repealing act expressly so provides."

In harmony with the defendant's contention before me, and in line with the ruling in State v. Showers, 34 Kan. 269, 8 Pac. 474 (cited by the defendant here), Judge Jenkins holds that the phrase "proceedings begun" means prosecutions begun at the time the repealing act was passed, and that the propositions laid down by the majority of the court are opposed to those common-law rules of construction for which the defendant contends here. Speaking of United States v. Reisinger, 128 U. S. 398, 9 Sup. Ct. 99, 32 L. Ed. 480, respecting the effect of which there has been much debate here, he says:

"The case of United States v. Reisinger is relied upon by the government to sustain this prosecution, but it is readily distinguishable from the case in hand. There the proviso to the act is to the effect that the rights of parties 'shall not be abridged or affected as to contracts in pending cases,' but there was no proviso with reference to criminal prosecutions for offenses committed under the repealed act. The Supreme Court ruled that the question whether the prosecution of offenses was saved was determined by general statute (section 13), and because the Legislature had not spoken in the new act to the question of offenses committed under the old act evidenced clearly an intention that with respect to that subject the general statute should control. The act saved contracts in pending causes because there was no general statute of construction which would save them, and rights would have been lost by the repeal except for the proviso."

It will be noted that in distinguishing the Reisinger Case from the Lang Case, Judge Jenkins assumes that in the former case the Supreme Court was dealing with a saving clause without the inclusion of which in the repealing act "contract rights would have been lost." In this, however, he appears to have been under a misapprehension, as is conceded here by counsel for the defendant, for, quoting from their brief:

"With those contracts the repealed law had no concern. They were not forbidden by the law repealed. They were entered into in the exercise of the valid contract rights of the parties."

This erroneous assumption by the dissenting opinion (which opinion the Standard Oil Company maintains states the true rule) would seem to deprive that opinion of the authoritative weight to which the great name of its author would otherwise entitle it.

As I read this case, the question presented to the Court of Appeals was precisely the question here. And, while the construction Judge Grosscup placed upon the special saving clause cannot be given to the clause found in section 10, the judgment of the court (which is most important) and the reasoning of Judge Baker are diametrically opposed to the position of the defendant in the pending cause and to the Kansas case and other authorities relied upon by the defendant.

Furthermore, the general trend of Judge Grosscup's reasoning is indicative of a strong indisposition on his part to countenance extinguishment by implication.

It is the duty of the court to enforce the will of Congress as expressed in the written enactment. In the ascertainment of that will, I am not at liberty to ignore the ultimate object of the law. That object was the establishment of uniform railroad rates, reasonable in amount. The former law had failed to accomplish this, and was therefore strengthened. Instead of being wiped off the books as having served its purpose, additional and severe liabilities were created, and more drastic remedies and penalties authorized. For the offense with which the defendant stands charged, the preceding Elkins law prescribed punishment only by fine. The view entertained by the present Congress respecting this offense finds expression in the provision authorizing the additional penalty of imprisonment in the penitentiary. And the court is asked to hold that this same Congress deliberately intended to pardon all unindicted prior offenders, whose conduct it was, more than all other causes combined, that moved Congress to enact the rigid and far-reaching measure of June 29th.

My opinion is that whereas, at common law, the repeal of a penal statute extinguished all penalties for offenses against its provisions in the absence of an express saving clause, under section 13 the repeal of a penal statute extinguishes no such penalties in the absence of an express extinguishing clause, which the rate law does not contain; that the so-called "saving clause" in section 10 was inserted for the purpose of definitely prescribing the rule of procedure that should control the prosecution of causes then pending in various stages in the courts, thus avoiding the confusion and controversy which, as experience has shown, must otherwise have resulted. For, had Congress not enacted that "the amendments herein provided for shall not affect causes now pending in courts of the United States, but such causes shall be prosecuted to a conclusion in the manner heretofore provided by law," the new procedure of the rate law would probably have controlled steps thereafter taken in such pending cases.

I reach this conclusion for the following reasons: In the first place, it is inconceivable that the Congress of the United States, while addressing themselves to the task of drafting a law the great object of which was to secure to all men fair treatment in respect of the transportation of property on the basis of absolute equality, could possibly have gotten into such a frame of mind that they would divide all prior offenders into two classes, and say that those who had been indicted should be punished, and those who, up to that time, had avoided the grand jury, should be pardoned. For Congress to do such a thing would be both absurd and unjust. In the second place, the saving clause is just such a provision as would have been drawn by a lawyer who had examined section 13 and desired to relieve the courts of unnecessary controversy growing out of questions of procedure. And, in the third place, in the light of the affirmance of Lang's conviction, it is not such a provision as would have been drawn by any lawyer whose purpose was to insure the pardon of violators of the law.

It is necessary to add, only, that in the court's opinion an indictment for violation of the Elkins law need not allege that the published rate is a reasonable rate. And without needlessly (as it seems to me) extending this review of the questions raised, it is my opinion that such an indictment need not set out in full the carrier's tariffs; that, with the exception of Nos. 3716 and 3722, the indictments sufficiently aver what the published rates were; and that the defendant's property was transported at the preferential rate; that the allegation that a certain named rate was in force between designated points, as shown by the published tariffs, necessarily carries with it its own negative that any other lawful rate was in force between the same points at the same time. The demurrers to indictments Nos. 3715, 3717, 3718, 3719, 3720, 3721, 3723, and 3724 are therefore overruled.

In the indictments Nos. 3716 and 3722 it is alleged that there was a common arrangement between several carriers for the transportation of property over their roads having a continuous line from Whiting, Ind., to southern points; that the lowest total rate for the transportation of petróleum products, as shown by the printed tariff schedules of the several carriers, was 39½ cents per hundred pounds; and that the product of the Standard Oil Company was transported between the designated points for 25⁹/₁₀ cents per hundred pounds. These indictments are bad, for the reason that the allegation that the lowest total rate was 39½ cents implies that amount to be the sum of the several local rates in force on the respective roads, and does not negative the existence of a joint through rate lower than the total of the locals. The demurrers to indictments Nos. 3716 and 3722 are therefore sustained