CHESAPEAKE & O. RY. CO. v. STANDARD LUMBER CO.

(Circuit Court of Appeals, Fourth Circuit. July 15, 1909.)

No. 866.

CARRIERS (§ 32*) — DISCRIMINATIONS — CONTRACT GIVING PREFERENCE TO SHIPPER.

A lumber company, which was a shipper of railroad ties, made a contract with a railroad company in 1899 by which it agreed to build a tie hoist for loading ties at a station, and the railroad company agreed to haul its ties to a designated point for $8.50 per car, and to return to the lumber company 10 per cent. of the freights so received to apply on the cost of the hoist until entirely paid for, when it was to become the property of the railroad company. In the meantime, however, it could be used only by the lumber company. The rate given was materially less than the published rate, which was charged other shippers. *Held*, that such contract was one designed to give the lumber company an undue preference or advantage over other shippers, in violation of Interstate Commerce Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3155), and was illegal and not enforceable in any part.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 84; Dec. Dig. § 32.*]

In Error to the Circuit Court of the United States for the Southern District of West Virginia, at Huntington.

Action by the Standard Lumber Company against the Chesapeake & Ohio Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

This is an action in assumpsit, brought by the Standard Lumber Company, a corporation of the state of Kentucky, against the Chesapeake & Ohio Railway Company, a corporation of the state of West Virginia, to recover $25,000 damages for a breach of contract set out in the declaration, and hereinafter printed in full. The declaration claims the right to recover, first, overcharge for freight; second, damages suffered by the Standard Lumber Company by reason of the alleged increase of freight rate over and above the amount set out in the contract; and third, the cost of building a tie hoist at Louisa, Ky., as provided for in the contract. At the time this contract was purported to have been made, the interstate commerce act of 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) was, in effect, prohibiting the making of any discrimination between shippers by a carrier, and, at the time the suit was brought, the Elkins act of 1903 (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]) was in force. The contract, as written, was between the Standard Lumber Company, the Chesapeake & Ohio Railway Company, and the Big Sandy Railroad Company; but it does not appear ever to have been executed by the Big Sandy Railroad Company, and the Chesapeake & Ohio Railway Company, by its plea of non assumpsit, puts the plaintiff upon proof of the execution of the contract, and requires that the authority of the party who purported to have signed the same be shown. The alleged contract is as follows:

"This memorandum of agreement made and entered into this 7th day of November, 1899, by and between the Standard Lumber Company, a corporation organized and existing under the laws of the state of Kentucky, party of the first part. and the Chesapeake & Ohio Railway Company and the Ohio & Big Sandy Railroad Company, parties of the second part, witnesseth: That the party of the first part is to build a tie hoist and connecting tracks intersecting the main line of the Ohio & Big Sandy Railroad Company, just east of their depot in said city, said tracks running through ———— street, in Louisa, and the property leased by George Stevens & Company, of Titusville,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Pennsylvania, north to the Big Sandy river, all at its own proper expense, except the rails, which are to be furnished by parties of the second part; and said parties of the first part are to maintain and operate the same and furnish to parties of the second part for transportation ties in car load lots, from time to time, until the matters hereinafter stated are consummated. In consideration of all of which, the parties of the second part agree that they will transport all ties coming over said hoist, for party of the first part, from Louisa, Kentucky, to Huntington, West Virginia, at a uniform rate of $8.50 per car, and from the net revenue accruing to the C. & O. Ry. Co. from such traffic shall be deducted ten per cent., which shall be refunded to party of the first part in liquidation of said expense for building said hoist and tracks, until the amount refunded shall equal the cost of construction of same, at which time the said hoist and tracks shall be and become the property of parties of the second part. Said cost to be ascertained from actual bills of expense to be furnished said C. & O. Ry. Co. from time to time, as the work progresses.

"In testimony whereof, the parties of the first and second parts have caused their names and seals to be hereto affixed by their properly authorized officers, the day and date first above written.

"Standard Lumber Company,
"Per T. J. Reynolds, Pres.
"The Chesapeake & Ohio Ry. Co.,
By F. M. Whittaker, Frt. Tfc. Mgr.

"Witness:
"E. B. Enslow,
"R. A. Jeffers."

Upon the hearing, the Chesapeake & Ohio Railway Company, hereinafter referred to as the "railway company," the defendant below, demurred to the declaration, which demurrer was overruled, and it then filed the general plea of non assumpsit.

It is contended by the complainant that; at and prior to the time of the making of the contract above mentioned, the lumber company was engaged in the purchase and manufacture of railroad cross-ties on and along the Big Sandy river in the state of Kentucky. The lumber company, in order to get its ties to market, floated the same down the Big Sandy river to its mouth, where it empties into the Ohio river, at which point they were distributed by railroad or the Ohio river to the various purchasers. At that time the railroad company had built a branch line from Cattlettsburg, Ky., to the Big Sandy river, to a place called Louisa, which is on the said river and about 25 miles from its mouth, and thus came in competition with transportation by means of the said Big Sandy river. It is also insisted by the plaintiff that the motive of the railroad company in entering into the contract was to secure the business which had theretofore been transported by the river, and that, accordingly, in compliance with the terms of the contract, the lumber company constructed, at great expense, a tie hoist and connecting track at Louisa, and commenced the delivery of ties to the railroad company in cars furnished by it; that this continued for about a year, when the railroad company advanced the rate of $8.50 per car of 200 ties, the cars having a capacity of from 300 to 400 ties. Later on the rate was changed to 5 cents per tie, making the rate from $10 to $17 and $18 per car; that the lumber company continued to ship ties, but by reason of the contract paid the increased rate under protest, and finally, not being able to continue its business at a profit at the rates given, it sold out its tie business. The complainant below seeks to recover from the railroad company the freight charges in excess of the amount set out in the contract, the damages suffered by reason of its being unable to fulfill certain contracts made upon the faith of the contract rate, and expenses incurred by it in building the tie hoist.

The court below held that the contract on its face was a valid contract, and that the fact that it was not executed by all the parties was not sufficient ground for demurrer, but that it was a question for proof as to whether it had been agreed to and carried into effect by the action of the railroad company; but the court further held that the railroad company had a right to change its freight rates, notwithstanding the contract, and that the lumber company

was not entitled to recover anything for overcharge or damages growing out of the change of rates, but that it could recover under the contract whatever the jury might find from the evidence it was entitled to for building the hoist. The case was submitted to the jury under instructions from the court, and a verdict was found in favor of the lumber company in the sum of $4,439.54.

F. B. Enslow (Simms, Enslow, Fitzpatrick & Baker, on the brief), for plaintiff in error.

C. N. Davis (C. W. Campbell, G. S. Wallace, and E. A. Marsh, on the brief), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and DAYTON, District Judge.

PRITCHARD, Circuit Judge (after stating the facts as above). The first and second assignments of error are as follows:

"First. The contract is shown to be incomplete upon its face, and there were no allegations in the declaration that the signatures of the Ohio & Big Sandy Railroad Company were waived by either of the parties, or that it was agreed upon and acquiesced in by the defendant without ever having been signed by the Ohio & Big Sandy Railroad Company; because, if the said contract had been ratified by the parties thereto, the declaration should have so stated, and suit should have been brought against both parties; because the contract shows on its face that, under the laws and statute governing railways and railway rates, the said contract was contrary to the statute, and incapable of being enforced, and not binding on either party. The trial court, however, taking the view of the statute contrary to the defendant's contention, overruled said demurrer and permitted the contract to go to the jury as evidence of the alleged agreement, holding that, although the railroad company could not be permitted to make a contract as to rates, and would have a right to change the same, still the plaintiff might recover in the action the money expended by it. The overruling of the demurrer and this view of the court as to the effect of the contract is assigned as the first error.

"Second. At the time the contract was claimed to have been executed, namely, in November, 1899, up to the time of the first shipment of ties over said road, the legal rate on ties shipped over the Ohio & Big Sandy Railroad and the Chesapeake & Ohio Railway, from Louisa, Ky., to Huntington, W. Va., was 3 cents per 100 pounds, or about 6 cents per tie. The tariff arranged under the contract for ties over the hoist in question was $8.50 per car, or about 4½ cents per tie, while the rate per car not taken over the hoist was $10, the difference of about one-half cent per tie in favor of the plaintiff, who operated the hoist. The tariff sheets introduced in evidence on the examination of W. F. Hite, division freight agent, showed this to be the fact, and showed the discrimination in favor of the plaintiff. The defendant, taking the view that the contract under the circumstances was illegal, and the illegality vitiated the same entirely and prevented the plaintiff from recovering on it, sought to show, in addition to the published rates, that the special rate allowed to the plaintiff and provided for in the contract was a discrimination in favor of the plaintiff, not allowed to other shippers over the road under like conditions and like circumstances, and therefore the whole contract was void. The court, however, while taking the view of the case that the railway company could not give the special rate provided for in the contract, held that the defendant was, however, liable to the plaintiff in this action for the money expended, and, holding that view of the cause, refused to permit the defendant to show the jury the facts showing that said rate was a discrimination, and the allowance of 10 per cent. on the freight bills a rebate. The defendant also claimed that to allow the plaintiff to recover under the contract would be to permit and make a discrimination in favor of the plaintiff over the other shippers, and thereby give the plaintiff an advantage over the other shippers of ties from Louisa on the same road and to the same destination, who were not permitted to participate in the rate claimed by the plaintiff or the advanta-

ges given it, and that the whole contract was but an effort on the part of the plaintiff to obtain an advantage in shipments under the contract; that said contract, not having been executed by the parties thereto, was never in fact in force, and that to allow the plaintiff to take advantage thereof would be in effect a violation of the interstate commerce laws governing rates and rebates, and would permit the plaintiff to be repaid the expenses of transporting its ties from the river to the railroad, which expense was not paid to other shippers and was illegal in its inception. And the defendant also claimed that if the plaintiff was permitted to recover for money expended in building a side track and a tie hoist for its own benefit, to be used until the rebates were paid for the cost of construction, and that then the hoist and side tracks were to go to the defendant, the plaintiff must show that it had complied with its contract, and had put itself in a position to transfer the track and hoist to the railway company; and, taking this view of the case, it offered to prove that the rate made was not made for any other party except for the plaintiff, that no party was given the same privilege, and, in addition, that the plaintiff had never put itself in a position to transfer the property to the railway company, but that it had itself sold and disposed of the greater part of the property, and applied the money to its own use, and had never conveyed the same, or offered to convey the tie hoist and side track, with the right to use the same, to the company; but the court, taking a contrary view of the case, refused to permit the defendant to show the discrimination, or to show that the track and hoist had ever been constructed on land to which the plaintiff had a right, or on which it had made arrangements for the use thereof, or transfer to the railway company on the payment of the cost thereof, and the defendant assigns this view of the contract and rulings of this court hereunder as the second ground of error."

These assignments of error embody the main points involved in this controversy; the principal question being as to whether the agreement between the Standard Lumber Company and the Chesapeake & Ohio Railway Company constitutes a valid contract, and this necessarily involves a consideration of section 3 of the interstate commerce act, as well as section 1 of what is known as the "Elkins Act." Section 3 of the interstate commerce act provides that:

"It shall be unlawful for any common carrier, subject to the provisions of this act, to make or give any undue or unreasonable preference or advantage to any particular company, * * *" etc.

Section 1 of the Elkins act, which was passed February 19, 1903, reads as follows:

"That anything done or omitted to be done by a corporation common carrier, subject to the act to regulate commerce and the acts amendatory thereto, which, if done or omitted to be done by any director or officer thereof, or any receiver, trustee, lessee, agent or person acting for or employed by such corporation, would constitute a misdemeanor under said acts or under this act, shall also be held to be a misdemeanor committed by such corporation, and upon conviction thereof it shall be subject to like penalties as are prescribed in said acts or by this act with reference to such persons, except as such penalties as are herein changed. The willful failure upon the part of any carrier subject to said acts to file and publish the tariffs or rates and charges as required by said acts, or strictly to observe such tariffs until changed according to law, shall be a misdemeanor, and upon conviction thereof the corporation offending shall be subject to a fine of not less than one thousand dollars nor more than twenty thousand dollars for each offense; and it shall be unlawful for any person, persons, or corporations to offer, grant, or give, or solicit or accept, or receive any rebate, concession or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed

by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practised. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concessions, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars: Provided that any person or any officer or director of any corporation subject to the provisions of this act or the act to regulate commerce and the acts amendatory thereof, or any receiver, trustee, lessee, agent, or person acting for or employed by any such corporation who shall be convicted as aforesaid, shall, in addition to the fine herein provided for, be liable to imprisonment in the penitentiary for a term of not exceeding two years, or both such fine and imprisonment, in the discretion of the court. Every violation of this section shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed, or through which the transportation may have been conducted: and whenever the offense is begun in one jurisdiction and completed in another it may be dealt with, inquired of, tried, determined, and punished in either jurisdiction in the same manner as if the offense had been actually and wholly committed therein. * * *"

The foregoing provision was adopted subsequent to the date of the agreement in question. At the time this contract was entered into between the parties the interstate commerce act of 1887 was in effect, and this act prohibits the making of any discriminations between shippers by carriers. While the contract purports to be between the Standard Lumber Company, the Chesapeake & Ohio Railway Company, and the Big Sandy Railroad Company, it does not appear to have been executed by the Big Sandy Railroad Company, and this is assigned as one of the causes on demurrer by the railway company.

The interstate commerce act requires:

"That all charges for services for handling property shall be reasonable and just; that no rebates, no drawbacks or other devices by which any person shall pay, or the carrier receive, a greater or less compensation shall be allowed; and that no undue influence or advantage shall be given to any person or traffic."

By an additional act, passed March 2, 1889, the interstate commerce act was amended so as to compel the carrier by mandamus to give all carriers similar terms and as favorable conditions as those given by a common carrier for traffic under similar conditions to any shipper. Where the parties to a contract agree to do an illegal act, such agreement is void. Under the head of "Contracts," Cyclopedia of Law and Procedure, vol. 9, p. 569, it is said:

"If the direct object of the parties is to do an illegal act, the agreement is void, and it is immaterial that either or both did not know that the object was illegal; for, as a general rule, ignorance of the law is no excuse."

Are the terms of the agreement in question in violation of the statutes to which we have just referred? In other words, is the agreement as to rates void? Is such an agreement inherently unlawful? Are its terms and conditions unenforceable? These are questions that must be carefully considered in determining the merits of this controversy.

The railway company insists that it now has the right to complain of the illegality of the contract, and to escape payment by reason of

such illegality, inasmuch as, at the time the contract was made, both the common law, as well as the act of 1887, expressly required a common carrier to transport traffic for all without unreasonable discrimination, either in charges or the facilities of actual transportation. Southern Ry. Co. et al. v. Tift, 148 Fed. 1021, 79 C. C. A. 536. This case was affirmed by the Circuit Court of Appeals for the Fifth Circuit, also in 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124.

It is insisted by the railway company that, in refusing to comply with this contract, it is simply obeying the plain mandate of the statute, and that it would be liable under the Elkins act, notwithstanding the fact that said act was passed subsequent to the execution of this contract. In the case of United States v. Great Northern Railway Company (C. C.) 157 Fed. 288, Hough, District Judge, in referring to this phase of the question, said:

"First. Although it may be assumed that no indictment could have been found under the interstate commerce act against the carrying corporation, yet, the arrangement above outlined was under that act alone illegal and unenforceable. Texas & Pacific Ry. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011. The said unlawful arrangement was not completed until 1904, when the moneys were paid. United States v. Hanley (D. C.) 71 Fed. 675. When the transaction was completed the Elkins act had made each and every part thereof not only unlawful, but a criminal offense. One part thereof, and certainly the most important, was giving the rebate and accepting the same, and it is a refinement of language to say that the rebate was given or accepted until the amount thereof was paid. This occurred in 1904, and this act was the crime complained of in the indictment. A solvent contractor may be said to have given some pecuniary advantage to another when he has agreed to give it, his contract being enforceable in ordinary course of law; but if a man agrees to give another an unlawful pecuniary advantage, something not enforceable at law at all, it appears to me plain that the person to whom the promise is made has gotten nothing whatever until he has received and pocketed the pecuniary fruits of such illegal arrangement. If the payment and acceptance of the rebate constituted a crime in 1904, I do not think that the passage of the Hepburn act prevented the finding of this indictment. On the contrary, within the period of the statute of limitations, I think the Elkins act is in full force as to offenses committed prior to the passage of the Hepburn bill, and can add nothing to the views expressed in U. S. v. Standard Oil Company (D. C.) 148 Fed. 719, U. S. v. Chicago, St. Paul, etc., Ry. (D. C.) 151 Fed. 84, and the decision of this court, per Holt, J., in U. S. v. D., L. & W. Ry. (filed Feb. 14, 1907) 152 Fed. 269.

"Second. Assuming that the offense sought to be reached by this indictment is the giving—i. e., the paying—of rebate moneys in 1904, the Elkins act is not ex post facto. It did not impose a punishment for an act which was not punishable when it was committed, nor did it impose additional punishment for such act, nor did it change the rules of evidence; and, if it did none of these things, it does not transgress the constitutional limitation referred to."

That the construction of the tie hoist in question inured to the benefit of the Standard Lumber Company, in that it gave such company a preference over other companies similarly situated, is apparent from an inspection of the agreement. In other words, it cannot be denied that the payment back to a shipper, as in this instance, of 10 per cent. on the freight bills paid by the shipper to the railway company, must necessarily result in the shipper getting its property transported at a lower rate than that indicated in the published schedules. Landis, District Judge, in the case of United States v. Chicago & Alton Ry. Co. et al. (D. C.) 148 Fed. 647, in discussing this question, said:

" * * * The word 'rate,' as used in the interstate commerce law, means the net cost to the shipper of the transportation of his property; that is to say, the net amount the carrier receives from the shipper and retains. In determining this net amount in a given case, all money transactions of every kind or character having a bearing on, or relative to, that particular instance of transportation, whereby the cost to the shipper is directly or indirectly enhanced or reduced must be taken into consideration. Applying this test to the case before me, the net cost to Schwarzchild & Sulzberger Company has been made $1 per car less than the published schedules represented that net cost would be. Viewing the transaction from the standpoint most favorable to the defendants, it amounts to the railway assuming the cost of getting the shipper's property to the carriers' rails for transportation—a substantial consideration not mentioned in, or contemplated by, the published schedules. * * * "

This agreement shows on its face that the railway company was to assume the cost of removing the shipper's property from the river to the carrier's rails for transportation. The fact that the shipper was to be reimbursed for the amount expended in the erection of the hoist clearly shows that it was the intention of the parties to thus indirectly give such shipper an advantage over other parties similarly situated. It could not be reasonably contended that, if the railway company had, in the first instance, erected this hoist, on its own account, it could have fixed a cheaper rate for a particular company engaged in delivering its ties over the same, and also denied the right to others to deliver their ties for transportation by the same method and at the same rate. Such conduct on the part of the railway company would undoubtedly have been in violation of the statute, and, when we come to analyze this contract, that is precisely what was proposed to be done by the terms thereof. If the agreement in this instance had been that the hoist in question was to be erected by the Standard Lumber Company for the railway company, and the lumber company paid for the same as provided therein, and it had been further provided that all shippers were to be given the privilege of removing ties from the river over the hoist thus erected for the purpose of being loaded by the carrier at a rate which applied alike to all shippers similarly situated, then, in that event, it would not have been subject to the objection that its terms contemplated the doing of an act which is made unlawful by the statutes to which we have referred.

In addition to what appears on the face of this contract, there is the further fact that this property, when sold by an employé of the lumber company, only brought the sum of $200, which amount was applied to the payment of the debts of the lumber company. It also appears that the tariff rate published was $8.50 per car, when the ties were taken over the hoist, as against a $10 rate when loaded by other means. It also appears that the lumber company charged the railroad company $1,500 for a boiler and engine, which their own agent testified was worth about $150, and also charged $3,505.70 for the material which went into the hoist; and it further appears that this material, when sold, only brought the sum of $200, as hereinbefore stated. This clearly indicated a purpose on the part of the lumber company to do by indirection that which it could not do directly, by fixing a fictitious price on the property in question. It appears from an examination of the record that evidence was offered tending to show that there was a dis-

crimination, and that there were other parties engaged in shipping ties who did not enjoy the same privileges and benefits the lumber company enjoyed. However, this evidence, upon the objection of the plaintiff, was ordered stricken out by the court, and the action of the court in this respect eliminated the question as to whether the agreement relied upon by the defendant in error constituted a valid contract.

In the case of Chicago & Alton Railroad Company v. United States, supra, 156 Fed. 558, 84 C. C. A. 324, the Circuit Court of Appeals, for the Seventh Circuit affirmed the ruling of the lower court. In that case the shipper constructed private tracks on its own property extending from a connection with the belt line railroad company to and around its buildings and used for loading cars for shipment. The railroad company made and published a schedule of through rates, including the belt line charge of $1 per car to such packing company on such shipments made by it and paid for at the schedule rate, on the ground that it was a payment for the use of its private tracks, thus making the rate charged $1 less per car than that published and charged to shippers generally from the same point. The court held that the facts of that case constituted the giving of a rebate, in violation of section 1 of the Elkins act. In the syllabus it is stated:

"Private tracks built by the owner of a packing plant on its own property, extending from a connection with the tracks of a belt line railroad company to and around its buildings, and used in loading cars for shipment, are not a part of the railroad system, but plant facilities; and the refunding by a railroad company, which made and published a schedule of through rates, including the belt line charge of $1 per car to such packing company on shipments made by it and paid for at the schedule rate, on the ground that it was a payment for the use of such private tracks, thus making the rate charged $1 per car less than that published and charged to shippers generally from the same point, constituted the giving of a rebate, in violation of section 1 of the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880])."

Also in the case of Wight v. United States, 167 U. S. 512, 17 Sup. Ct. 822, 42 L. Ed. 258, it was decided that:

"Hauling goods on the Pittsburg, Cincinnati & St. Louis Railroad Company from Cincinnati to Pittsburg, and delivering them to a consignee in his warehouse from a siding connection, and hauling goods for him from and to the same cities on the Baltimore & Ohio Railroad Company, and delivering them to him from the stations of that road in Pittsburg, there being no siding connections, is transportation 'under similar conditions and circumstances,' within the meaning of section 2 of the interstate commerce act of February 4, 1887, and a rebate allowed by the Baltimore & Ohio Railroad Company to compensate for cartage to his warehouse is a discrimination against other shippers over that road to whom no rebate is allowed."

There the hauling was done by wagons, and in the case at bar the transportation was by machinery; and it is sought by the agreement in question to compel the railroad company to pay for the value of the machinery. The fact that the tie hoist thus erected was not thrown open to the public, and all shippers given an opportunity of hauling their ties by that method, shows conclusively that this hoist was not intended to be used by the railroad company for transportation purposes generally, but that the transaction was intended solely for the purpose of inducing this particular shipper to transport its ties over the lines of the railroad company. If the erection of this hoist had been

intended for general use, the railroad company certainly would not have permitted it to be sold at a nominal price, as it was; and this, among other things, shows most conclusively that the whole transaction was a subterfuge, by which one shipper was to be given an advantage over others similarly situated.

The Interstate Commerce Commission, "In the Matter of Allowances for Transfer of Sugar," in its decision rendered December 12, 1908 (14 Interst. Com. R. 627), in referring to the cases of Wight v. United States, supra, and Chicago & Alton R. R. Co. v. United States, supra, said:

"All the tariffs purport to make the allowance as compensation for transfer. It necessarily follows that if the allowance is to be sustained the transfer of goods to the possession of the carrier must be held to be the carrier's duty, for which the shipper making the transfer is entitled to compensation. Such is not the law, and the first to resist the attempt to impose such duty upon the carriers would be the carriers themselves. Within the present year this Commission has decided at least two cases in favor of carriers involved in this proceeding, and has held that the delivery of goods to a carrier and the receipt of goods from a carrier are duties devolving upon the shipper, for which the carrier cannot be compelled to pay. For carriers to undertake to make to shippers allowances based upon the performance by the shippers for themselves of services which they are legally bound to do for themselves is for the carriers to violate the act to regulate commerce."

It was also held by the Commission:

"That it is not a part of the carrier's duty to bear the expense of transfer of goods from the shipper to the carrier. For carriers to undertake to compensate shippers for performing services which the shippers are legally bound to do for themselves is for the carrier to violate the act."

The court below held that the lumber company was not entitled to recover anything for overcharge or damages growing out of the change of rates, but that it could recover under the contract whatever the jury might find from the evidence it was entitled to for building the hoist. In other words, the court was of the opinion that the contract in question was not binding upon the railroad company to the extent of preventing it from changing its rates, so as to make them uniform and apply alike to all shippers similarly situated; but, notwithstanding this ruling (which must necessarily mean that the contract was invalid in so far as rates were concerned), the court was of the opinion that the defendant in error was entitled, under the contract, to recover the cost of erecting the tie hoist.

When we view this agreement, together with the other evidence offered, in the light of the cases quoted, we are forced to the conclusion that the agreement in this instance is in violation of the provisions of the statutes enacted for the express purpose of regulating the conduct of a common carrier in its transactions with a shipper. An agreement which contemplates the doing of an unlawful act is absolutely void, and cannot be enforced for any purpose; and this is especially true in a case like this, where it was, on the one hand, the manifest purpose of the railroad company to give a shipper an undue advantage over other shippers similarly situated, and, on the other hand, the intention of the shipper to receive an undue advantage over another shipper under like conditions.

There are numerous assignments of error; but we do not deem it necessary to consider them seriatim, but will content ourselves with saying that we are of the opinion that the court erred in holding that the agreement in question constitutes a valid contract.

For the reasons stated, the judgment of the court below is reversed, with instructions to proceed in accordance with the views herein expressed.

Reversed.